THOMAN *v.* MILLS.

CORPORATIONS — ACCOUNTING — WRONGFUL SALE OF CORPORATE ASSETS—DAMAGES.

Where complainants, who were minority stockholders in an insolvent railroad company whose assets were sold by defendants to a corporation in which they were principal stockholders, without observing the due formalities of law, and without the consent of complainants, bring an action for an accounting, and for damages based on the wrongful sale, and, on the trial, it was shown that at the time of the trans-

fer the liabilities of the railroad company, which were assumed by the purchaser as the consideration, largely exceeded the assets, and the sale was made in good faith, and the result would have been the same if the legal formalities had been observed, a judgment for nominal damages only will be affirmed. McALVAY and MONTGOMERY, JJ., dissenting.

Appeal from Ingham; Wiest, J. Submitted November 18, 1908. (Docket No. 13.) Reargued October 11, 1909. Decided December 31, 1909.

Bill by Frederick Thoman and Jacob Stahl against Myron W. Mills and David Mills, executors of the last will and testament of Nelson Mills, deceased, and others, for an accounting. From a decree for complainants for nominal damages only, they appeal. Affirmed.

*R. H. Person* and *Black, Reasoner & Hayden*, for complainants.

*Sanford W. Ladd* (*Walbridge & Kelley*, of counsel), for defendants.

MOORE, J. This proceeding was commenced in April, 1905. The bill of complaint is filed to compel the defendants to account, as for a trust fund, for the assets and property of the Lansing, St. Johns & St. Louis Railway Company, which, it is claimed by complainants, they have attempted to secure for themselves, as officers and directors, and for all profits which accrued to the defendants by reason of their use of the property. The complainants were stockholders in the Lansing, St. Johns & St. Louis Railway Company, and it is claimed that their equitable rights in the property owned by that company have never been cut off by any proceeding authorized by law.

The important portions of the prayer for relief read:

" That the aforesaid Myron W. Mills and David Mills, executors of the estate of Nelson Mills, the said Myron W. Mills, James R. Elliott, and David Mills, and the said

Lansing & Suburban Traction Company may be by the court required to account to your orators for the due value and proportion of the interest of your orators in the property as hereinbefore described of the said Lansing, St. Johns & St. Louis Railway Company, and for the profits, advantages, and benefits obtained as herein alleged."

The case was heard in open court. The circuit judge said (we quote from his opinion):

"I am satisfied that the defendants must account for the value of the stock held by the complainants in the Lansing, St. Johns & St. Louis Railway Company as of the date it was converted by way of resolution transferring the assets of that company to the defendants' company, the Lansing & Suburban Traction Co. Creditors of a corporation must proceed to have their claims satisfied in the usual way, and, if they occupy the dual position of creditors and majority stockholders, they must yet observe the rights of the minority stockholders when taking measures to satisfy their claims as creditors. The way adopted may have been a short cut to the inevitable result; but the law does not recognize such short cuts when it deprives any one interested of the right to have due process of law observed. I am not certain whether complainants are entitled to substantial damages, and the question of the amount, if any, they should recover from defendants, is left open for further argument by counsel and further determination by the court. The defendants, having received the assets of the Lansing, St. Johns & St. Louis Railway Company on the 3d day of March, 1904, must account for the value of the stock of the complainants in that company as of that day. * * * I say this now, to indicate that upon the reargument of the question of damages the stock held by complainants will be treated as converted on the 3d day of March, 1904, and the court will fix its value as of that day, and not follow it into other companies, and the question will have to be considered the same as any other conversion of specific property."

After the reargument the circuit judge expressed himself as follows:

"This court in an opinion filed February 21, 1907, held defendant guilty of the conversion of the complainants' stock in the Lansing, St. Johns & St. Louis Railway Company as of March 3d, 1904, and the matter now for deter-

mination is the value of such stock on that date. To make
this determination requires a consideration of the condi-
tion of the company on that date, what it had by way of
tangible property and prospects capable of being depended
upon, and what its obligations amounted to, and its ability
to meet the same then or at any future date.

"Complainants insist the court, in determining the val-
ue of their stock, should consider the use made of the as-
sets of the company by the defendants.  An objection to
this way of figuring value for complainants lies in the fact
that the assets in defendants' hands could be used un-
trammeled by the indebtedness they were subject to, in
the use the company could make of them.  In the hands
of the company, its property and prospects were so loaded
down with its obligations that no substantial value can be
placed upon them.  They were worth, if anything at all
over and above the obligations, only the amount that, un-
der the most favorable circumstances, might have been
realized out of their management by the company.  The
Lansing, St. Johns & St. Louis Railway Company had no
funds, or any way to obtain funds.  Its property was
mortgaged for $500,000 for the construction of the road.
It owed nearly $100,000 besides to the contractors for con-
struction, and it owed other debts.  Its contract for the
construction of the road compelled it for lack of funds
to practically give everything to the contractors.  It
could not meet its obligations.  The bonus subscriptions
fell flat.  Its treasury was empty, and it is safe to say
that no one could have been found willing to pay its ob-
ligations for all its property and prospects.

"Complainants had put in the venture in money about
$300 each, and for that and their time and efforts had each
received stock in the company of the par value of $7,300.
I very much doubt, had there been an assessment of $50
on their holdings in February, 1904, whether either one of
them would have put that sum into the venture, for, had
the mortgage securing the bonds held by the contractors
been foreclosed, the contractors would have had to bid the
property in, for no bid could have been expected large
enough to have paid the contract obligation.  The best
way I know to determine what the defendants took be-
longing to complainants is to determine what the com-
plainants had of value in the company on the 3d day of
March, 1904.  These complainants, together with Frank
L. Dodge, filed a bill of complaint against the Lansing,

St. Johns & St. Louis Railway Company in March, 1902, asking this court to permit them to withhold the subscription stock from the company, on the ground, among others, that the company was insolvent. The company in its answer denied its insolvency. It was not necessary in that case to decide whether the company was solvent or insolvent; but the position then assumed by these complainants militates against them now upon the question of the value of their holdings in that company.

"Frank L. Dodge sued the purchasers of the Lansing, St. Johns & St. Louis Railway Company in this court for the debt due him from the latter company for services performed by him for it, and these complainants were witnesses for him in that case, and it is a grave question whether they are not now estopped from claiming there was no sale to the Lansing & Suburban Traction Company, for Mr. Dodge's suit was upon the theory that there was a sale, and therefore an assumption of the debts of the Lansing, St. Johns & St. Louis Railway Company.

"Having in mind what it owed, its prospects and condition, I am unable to say the stock of the Lansing, St. Johns & St. Louis Railway Company was of any substantial value the day defendants converted the same. I quite agree with the counsel upon the rule that, when it cannot be determined with certainty just the extent of damage arising from a conversion, the court should see the innocent saved from loss; but this case does not fall within such rule, for the reason that, before the rule can be invoked, some substantial damage must appear. The defendants being guilty, however, of the conversion of complainants' stock in the company, and the damages of the complainants being only nominal, the decree will fix the damages at six cents, and no costs will be awarded either party."

The complainants appealed from the decree in the lower court. The defendants did not appeal. The oral arguments and the briefs of counsel indicate a good deal of bitterness toward each other on the part of the litigants, who say very hard things of each other. We shall endeavor to make no further reference to that feature of the case.

The first Lansing, St. Johns & St. Louis Railway Company was organized in 1897. Its capital stock was

$250,000. Of this stock each of the complainants had 36 shares, of the par value of $100 a share. This company proposed to build a line of electric road from Lansing to St. Johns, and then to St. Louis in this State. It succeeded in securing certain franchises and rights of way and attempted to get some one to construct the line. In April, 1900, another company of the same name was organized with a capital stock of $500,000. Each of the complainants had 72 shares of stock in this company, which they received in exchange for the stock in the former company. Each of the complainants was a director in both of these companies. In January, 1901, for the purpose of paying a debt of the company of $140, each of the seven directors of the company paid in $20 in cash, and each received therefor one share of stock. Shortly after the second company was formed, the work of construction was entered upon by Messrs. Mills, Percival, and Norris, who had a contract with the company, the details of which it is not necessary to relate here, further than to say they were given $500,000 in bonds of the company, secured by mortgage, and $300,000 of its capital stock. At the same time the two complainants placed their written resignations as directors in the hands of Mr. Mills to take effect at any time that he might designate. Later the resignations were accepted and new directors elected in the place of complainants.

In 1902 the litigation arose to which reference was made by the circuit judge in his opinion. Before the sale was made which gave rise to the present litigation, nearly $400,000 had been put into the enterprise by John E. Mills through the assistance of his father, Nelson Mills. The complainants did some work in securing bonuses and right of way. Their cash contribution did not exceed $320 each. It was expected to run the road as an electric road by a method which was in an experimental stage and did not prove to be a success. The road was never built farther than St. Johns. The contractors were not paid according to the terms of their contract. The sums

secured in the way of bonuses were small. The affairs of the company were in a bad way. The stock standing in the name of John E. Mills was, by unanimous vote of the directors, after the death of John E. Mills, transferred to Nelson Mills, as was all the unissued stock. This was done because of reasons that were stated in detail in the resolutions, which reasons were proper ones. In March, 1904, a stockholders' meeting was held. Defendants claim due notice was given of this meeting. Complainants claim they had no legal notice of it. Upwards of 4,000 shares of the 5,000 shares of the capital stock were represented. At this meeting it was voted to transfer the Lansing, St. Johns & St. Louis Railway Company to the Lansing & Suburban Traction Company, if the latter company would assume the debts and liabilities of the former company. This was soon thereafter done. The complainants within a day or two learned of what was done. Later, in March, the action of the stockholders was ratified by the board of directors; but one of them voting against it. The Lansing & Suburban Traction Company also acquired by purchase the Lansing City Electric Railway Company, paying therefor $65,000, and assuming debts amounting to $100,000 or upwards. Later the Lansing & Suburban Traction Company, with many other properties in the central part of the State, became the property of the Michigan United Railways Company. There is nothing in the record to indicate a want of good faith in the sale of the company in which complainants were stockholders; but it is insisted by complainants there was a lack of good faith, and further that, even if there was not, as the forms of law were not followed, a constructive fraud was perpetrated upon them.

We quote from the brief of counsel:

"By becoming officers and directors of the Lansing, St. Johns & St. Louis Railway Company, the defendants became trustees for the benefit of all the stockholders interested in that company. As majority stockholders in the Lansing, St. Johns & St. Louis Railway Company, the

defendants also owed a duty to the complainants as the minority stockholders to manage the affairs of the concern for the best interests and profit of all the stockholders.

" 'The directors of a corporation are ordinarily invested with the most extensive powers of management. They are empowered to represent the company in all its business transactions and ventures; and the entire corporate affairs are placed in their charge, upon the trust and confidence that they shall be cared for and managed for the common benefit of the shareholders, and in accordance with the provisions of the charter agreement. It is manifest therefore that the directors of the corporation occupy a position of the highest trust and confidence, and that the utmost good faith is required in the exercise of the powers conferred upon them.' 1 Morawetz on Private Corporations (2d Ed.), § 516.

" Directors occupy the position of trustees towards the stockholders. 2 Cook on Corporations (4th Ed.), p. 1262, § 648, note 3. And it has been frequently held that, even though the directors may be acting in good faith in transferring the property of the corporation to themselves, the transaction is fraudulent in law. It was held in the case of *Ervin* v. *Navigation Co.*, 27 Fed. 625, that the rights of stockholders could not be thus cut off, where a majority of the stockholders attempted to transfer all its assets to another company of which they were owners.

" 'Among the disabilities imposed by courts of equity upon those who occupy fiduciary relations towards others, respecting property which is to be administered for beneficiaries is that which precludes the fiduciary from purchasing the property on his own account.' *Ervin* v. *Navigation Co.*, 27 Fed. 625.

" 'Aside from the want of legal power already referred to, a court of equity will not permit the directors of a corporation, who are not only trustees for the stockholders of the corporation, but for its creditors as well, to thus dispose of the corporate property to themselves, or for their individual benefit. However in fact intended, equity treats such transactions as fraudulent because it operates as fraud upon *cestuis que trustent.*' *Farmers' Loan & Trust Co.* v. *San Diego St. Car Co.*, 45 Fed. 527.

" 2 Cook on Corporations (4th Ed.), p. 1288, § 653; *Goddard* v. *Importing Co.*, 9 Colo. App. 306 (48 Pac. 279); *Fishel* v. *Goddard*, 30 Colo. 147 (69 Pac. 607); Eaton on Equity, p. 430, § 205; 1 Beach on Trusts & Trustees, p. 207, § 100; *Hindman* v. *O'Connor*, 54 Ark. 627 (16 S. W. 1052, 13 L. R. A. 492, and note)"—citing, also,

*Smith* v. *Smith, Sturgeon & Co.*, 125 Mich. 234 (84 N. W. 144); *Sparrow* v. *E. Bement & Sons*, 142 Mich. 441 (105 N. W. 881, 10 L. R. A. [N. S.] 725).

It is their further claim that the circuit judge was wrong in giving them only nominal damages. They assert that defendants made large sums of money as the result of their conduct. We do not think the questions of law are troublesome, in view of the record as we find it. It will be observed that the complainants do not pray in their bill to be allowed stock in the Lansing & Suburban Traction Company, in lieu of their stock in the former company. A reference to the prayer for relief already quoted will show that complainants seek to recover the value the property of the Lansing, St. Johns & St. Louis Company has been to the Lansing & Suburban Traction Company and to the individuals named as defendants who are stockholders in that company. Counsel for complainants make a computation of values based upon the relations of the Lansing & Suburban Company and two of the stockholders in the prior company and also based upon an entry appearing in the books of the Lansing & Suburban Company which it is said is an admission of values, though the person who made the entry testified it was a mere matter of bookkeeping and was not based at all upon actual values. A careful examination of the record compels the conclusion that the computation is too chimerical to be accepted as a basis for a decree in favor of the complainants.

The record does not leave the question of values in the field of conjecture. It discloses that in March, 1904, the affairs of the Lansing, St. Johns & St. Louis Company had reached an acute stage. The original purpose to operate the road as an electric road had proven a dismal failure. The receipts from bonuses were very small. The road had no arrangement by which its cars could run into the city of Lansing. Its dummy train was drawn by a steam locomotive. The entire receipts of the road from the beginning of running its cars until March, 1904, a

period of 26 months, were less than $8,000. This did not take any account of the interest charge on its debts, which was in excess of $50,000. The company was hopelessly in debt, and the debts constantly increasing, with no relief in sight. Unless conditions soon changed for the better, it could not continue as a going concern. Mr. Mills had invested about $400,000 in money in the undertaking. If he had resorted to the courts to enforce his claim, the road would not have sold for enough to pay it, and the stockholders would have received nothing. We have already recited what was done. There was a failure to literally comply with the law in making the sale; but it was made for an adequate consideration, and for the full value of the property. If all the formalities of the law had been followed, the result would have been the same, and the stockholders would have no reason to complain. The road at this time was insolvent, and the stock was worthless. After the road was sold and the Lansing & Suburban Traction Company had also taken over the Lansing city lines, the Suburban Traction Company was able to borrow, with the aid of Mr. Mills' indorsement—Mr. Mills was regarded as a very wealthy man—about $400,000. This money was expended in betterments, and the cars were run into the city of Lansing. The gross earnings of the two lines were kept separate, and, while they were operated as an entity, it is not difficult to determine from the record what charge should be made against the St. Johns line as its just share of the cost of operation. These figures show that from the time the sale was made up to the time when the proofs were closed, the net earnings of the line at no time reached the sum of $10,000 a year. This was exclusive of the charge for interest on the debts and some other proper charges. The debts assumed by the Lansing & Suburban Traction Company, as the consideration for the purchase, were in excess of $600,000. The interest charge, of course, would be in excess of $30,000. Not only does the record fail to show that defendants have profited by failing to literally follow

the law in making the sale and in taking over the property, but it shows affirmatively that at no time has the property taken possessed any value in excess of its just liabilities.

The cases cited by counsel for complainants have been examined. A reference to them will show that they are easily distinguishable from the case under consideration. It is not believed a case can be found where relief was granted to a stockholder in a prior corporation which was sold to a later corporation under the circumstances disclosed by this record.

The decree is affirmed, with costs.

BLAIR, C. J., and GRANT, HOOKER, and BROOKE, JJ., concurred with MOORE, J.

McALVAY, J. (*dissenting*). There is no dispute as to facts in this case, and no claim made by any one that the disposition made by the defendants of the stock of complainants in the corporation of which they were officers and directors was lawful or justifiable. Upon this proposition the opinion of Mr. Justice MOORE agrees with that of the learned circuit judge who tried the case. There can be no doubt but that both are as to that proposition absolutely correct.

It appears to me the conclusion of Mr. Justice MOORE, that it cannot be ascertained what was the actual value of this stock, or that it, in the then condition of the corporation, was of any market value, and therefore complainants are entitled to recover only nominal damages, is not supported by the record, or the principles of law which I think should be applied to this case. The relation between complainants and the officers and directors of this corporation who unlawfully appropriated complainants' property was a fiduciary relation. They were trustees and bound to care for and protect complainants' interests, and were strictly accountable to them in case of breach of trust. The manipulation by the defendants, who were active in making the unlawful sale, was not in the inter-

ests of complainants; but their property was appropriated and used by them in such a manner as can leave no possible doubt as to the character of these acts, nor as to the intent of these defendants. Defendants have never denied their conduct or intentions. Upon this record they are confessedly guilty, but interpose the defense that the damages on account of the wrong committed are nominal. I do not agree that the record shows the damages complainants have suffered in this case, for the wrongful appropriation of this property, are merely nominal, and, in considering the case, its cost to complainants, or what they may have considered it worth, should not be considered. It was their property and considered by defendants of sufficient value to acquire its control and possession by the means adopted, and presumably necessary to carry out the scheme which they had devised, and which eventually was successfully consummated by the use of this and other stock of this corporation. The record shows that defendants did profit by this transaction. The books also show the same thing. These are admissions by them, and the stock excuse that this showing was a mere matter of bookkeeping deceives nobody. It would be grossly inequitable to allow them to profit by this unlawful appropriation. They are estopped in law and morals from denying accountability for such value as this property has been and is to them. This is a case where complainants are entitled to follow this property into whatsoever form or situation it may be shown to be, and have it restored to them, or recover its fair value in the condition they find it.

"As between *cestui que trust* and trustee, and all parties claiming under the trustee, otherwise than by purchase for a valuable consideration without notice, all property belonging to a trust, however much it may be changed or altered in its nature or character, and all the fruit of such property, whether in its original or altered state, continues to be subject to or affected by the trust." 28 Am. & Eng. Enc. Law (2d Ed.), p. 1108, note 10, citing *Board of Fire & Water Com'rs of Marquette* v. *Wil-*

*kinson,* 119 Mich. 655 (78 N. W. 893, 44 L. R. A. 493), and other cases.

The special prayers of the bill of complaint, and the general prayer for relief therein contained, are in my opinion sufficient to warrant the relief to which complainants are entitled. The powers of a court of equity are broad, and where, as in this case, the acts done are admitted, and the result has been of the nature and extent herein stated, such court does not hesitate to grant relief to parties appealing for the exercise of its equitable powers. The property of complainants appropriated by defendants was impressed with a trust to be followed in their hands or the hands of others with notice, and its value recovered by complainants in whatsoever form found. The clear conception of the equities of the case have been purposely clouded by defendants, whose argument is that complainants' interest was worth nothing at the time of appropriation, and consequently a decree for a nominal amount was equitable. It would appear that defendants have overlooked the fact that the decree from which they have not appealed decides that there was an unlawful taking, and therefore under the law which we think applies to the case the increased value, if any can be shown was given to it by the activities of defendants, belongs to complainants. The record does not warrant the conclusion that this taking was simply an oversight in service of a notice of the meeting when the action was taken. On the contrary, the record shows the express intention to cut off such of these stockholders as they desired, *and leave them to their legal* remedy. This active fraud was followed by acts which clearly indicate the intention that, to ascertain their legal rights and interests in this property, stockholders who had been shut out would have no easy task.

An examination into the actual indebtedness of the Lansing & St. Johns Railway Company will, perhaps, be instructive and helpful in solving the difficulties of this case. It was capitalized for $500,000, and bonds of that amount were issued. The construction contract was given

to John E. Mills and others to construct this road for its entire length for $100,000 cash, to be paid as follows: $35,000 to be paid on the completion of the first 10 miles, $35,000 when second 10 miles were completed; and the balance when a total of 25 miles was completed; also to issue to them 60 per cent. of the total capital stock on demand, at any time after the contract was executed; and, as a further consideration, to bond the road at $25,000 per mile, and deliver the bonds to the contractors. $500,000 bonds of an authorized issue of $1,750,000 were issued, certified by the Detroit Trust Company, trustee, and delivered to John E. Mills. These bonds were secured by a mortgage. No other bonds were then issued. John E. Mills negotiated a loan of $175,000 secured by a pledge of the bonds and the indorsement of Nelson Mills. The contract entered into was never completed by the contractors. John E. Mills became sick. His father, Nelson Mills, paid the $175,000 note given to the Detroit Trust Company. The bonds pledged as security were then turned over to him. No statutory foreclosure and sale of the pledged property was had. In 1902 complainants were voted out of office as directors. Later defendants became directors, and, voting this stock which had been issued to them, controlled the organization. In order to make them eligible, some of them had been given a share of stock each. In 1903 defendant Myron W. Mills became president and James R. Elliott vice president. Then, for a claimed consideration that rights of way between Lansing and St. Johns had been procured and paid for by John E. Mills, the balance of the treasury stock, being all the remaining unissued stock of the corporation, and all subscription stock issued but not paid for, was voted to be issued to Nelson Mills, successor to all the rights of John E. Mills, giving him control or actual possession of 3,980 shares of the 5,000 shares of stock. This was done without any showing in the record of the amount actually involved. The record shows that the Mills stock was all voted at all of the meetings in favor of these different propositions

above stated. The record does not show that any of the defendants except the interest now represented by Myron W. Mills ever paid any consideration for any of the stock in this company, or invested any money in any of the transactions involved. Defendants claim that this corporation was at that time indebted as follows: Bonded indebtedness and interest, $571,000; balance unpaid on contract for construction, $60,000; total, $631,000. This is the construction contract which John E. Mills and others undertook to perform, but never completed further than St. Johns, and we do not find in the record that this balance was a valid subsisting indebtedness, nor do we find that more than $175,000 of indebtedness existed at this time against the bonds, which were held by the Mills interest as security for practically all of the indebtedness.

About this time another corporation, called the "Lansing & Suburban Traction Company," was organized by these defendants for the purpose of taking over the Lansing & St. Johns Company and the Lansing City Electric Railway Company. This last-named road the Mills Company and defendants Elliott and Moore had acquired for $65,000, which was paid by a note of the Mills Company for that amount. In this transaction also none of the defendants except the Mills interest paid any consideration. The transfer of the Lansing & St. Johns Company was made in consideration of the assumption of its indebtedness by the new corporation, when the Mills interest voted the majority of the stock. The Lansing City Electric Railway Company was transferred for $65,000 and the assumption of $100,000 indebtedness. These transfers occurred in March, 1904. John E. Mills had died in July, 1903. Nelson Mills became ill, and, for the purpose of carrying on these transactions, the Nelson Mills Company was organized, which included all of these individual defendants; Moore and Elliott holding one share of stock each. The articles of incorporation of the Lansing & Suburban Traction Company were filed March 9, 1904. The incorporators were Nelson Mills, Myron Mills, James

R. Elliott, and George G. Moore, who were named as directors and officers. Elliott and Moore put no money into the deal. It was capitalized for $1,000,000, of which $10,000 was issued to each of the above named. Nelson Mills died March 15, 1904.

The book value put upon these properties combined in this was $1,727,515.92. This is the evidence defendants claim was only a matter of bookkeeping. Whatever they may call it, it was the basis used from which was deducted all bonds and indebtedness, leaving $1,000,000 credit, upon which the entire stock was treated as fully paid, and the majority part of it issued to and held by defendants as such. At this time some of the original stockholders of the Lansing & St. Johns Company, who were identically interested as these complainants, were given, for their 73 shares, 100 shares of the Lansing & Suburban as fully paid and nonassessable. Defendants Mills and Elliott represented that this stock was worth about par. The rights of these original stockholders were explicitly recognized. A bond issue of the new company was negotiated for $750,000 for the purpose of taking up and canceling the outstanding bonds of the two old companies, and for making extensions and additions to the properties. $300,000 of the bonds of the Lansing & St. Johns Company held by Nelson Mills to secure $175,000, which he had paid as before stated, were at this time canceled, leaving but $200,000 of said bonds outstanding as such security. This was done with the consent of the Detroit Trust Company and Mr. Mills. It will be understood that this cancellation wiped out $300,000 of the claimed indebtedness of the Lansing & St. Johns Company, which defendants insist must be considered in this case as part of its indebtedness. This clearly shows that these bonds of this company were merely security for the indebtedness to Mills. A sufficient amount ($175,000) of the Lansing & Suburban bonds were issued to take up the old bonds of the two roads merged and take care of

extensions, etc. All of these bonds were in fact placed in the hands of the Mills Company, which hypothecated them with the Knickerbocker Trust Company for a loan of $450,000. Later another trust deed was made for $1,000,000 to provide for the retirement of the $750,000. The balance of which ($250,000) was used as collateral to loans.

The next step taken by these defendants was a project to merge the Lansing & Suburban Traction Company with several other properties which they had acquired, or intended to acquire, into a corporation called the "Michigan United Railways Company." This corporation was organized with a capital of $5,000,000. It made a trust mortgage for $7,500,000 for the purpose of acquiring and paying for the properties to be merged. Defendant Myron W. Mills was president of this corporation, and defendants Elliott and Moore directors. The Lansing & Suburban Traction Company was sold to the new corporation for $1,000,000 of its common stock. Provision was made in the trust mortgage that, of the bonds to be issued, $1,600,000 should be delivered to the president, Mills, or the vice president, Elliott, for which they were not to be accountable to anybody. This was done, and out of the proceeds the Mills Company was paid in full for all claims of every nature which arose out of the transactions had with the Lansing & St. Johns road, and $240,000 were paid in profits to defendants. A more extended statement of the history of this transaction will be found in *Dodge* v. *Mills*, 150 Mich. 394 (113 N. W. 1123).

These facts relative to the Michigan United Railways are material as showing that the claim, as above stated, of the Mills Company, was satisfied. This is in fact the culmination of this chapter in high finance. All the facts herein narrated show that a deliberate plan was conceived and carried out to absolutely ignore the rights of complainants in this property. The record shows a strained effort to inflate the indebtedness of the Lansing & St. Johns Company contrary to the facts. It shows that this.

property and its prospects were valuable, and so known to be by defendants; that they paid for it about twice as much as for the Lansing City Electric Railway property; that they recieved for it from the Lansing & Suburban par value for all its stock; that they recognized the same rights these complainants are here contending for in others who owned equal stock, and paid them in full in stock, share for share, with an addition, called "a gift," of 27 shares, making $10,000 to each. The Mills people were simply the bankers of this combination. They were at no time without security which they considered good, and the result shows that their judgment was good. Not only have they been paid in full, but have taken their share of the balance of $1,600,000 in profits which have been divided between them, and of the $1,000,000 in stock in the Michigan United Railways, which was distributed to them. As said earlier in this opinion, complainants are entitled to the value this stock acquired in the hands of defendants, which they recognized, and upon which they repeatedly acted, and that was its par value. There is nothing chimerical or speculative about this. It is the application of equitable principles which are fundamental to facts which are not in dispute. Defendants relegated these parties to such rights as the law afforded them, and this court finds that each is entitled to the sum of $7,300, with interest from March 9, 1904.

A decree should be entered in favor of complainants modifying the decree of the circuit court in accordance with this opinion, and with costs of both courts.

MONTGOMERY, J. I concur in the view that complainants are entitled to recover substantial damages, but am not prepared to say that the amount should be that stated in the opinion of Mr. Justice MCALVAY.