STEBBINS et al. v. MICHIGAN WHEELBARROW & TRUCK CO. et al.

(Circuit Court of Appeals, Sixth Circuit. January 6, 1914.)

No. 2,345.

1. CORPORATIONS (§ 190*)—TRANSFER OF ENTIRE PROPERTY AND ASSETS—ACTION BY MINORITY AGAINST MAJORITY STOCKHOLDERS—BURDEN OF PROOF.

Majority stockholders of a corporation, who join in authorizing and effecting a transfer of all of its property to a new corporation, in which they also become stockholders, acquiring practically a controlling interest, have the burden of proving, as against dissenting minority stockholders, who are given no interest in the new company, that the amount received for the property was its full value.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 723–731; Dec. Dig. § 190.*]

2. CORPORATIONS (§ 182*) — TRANSFER OF ENTIRE PROPERTY AND ASSETS — RIGHTS OF MINORITY STOCKHOLDERS.

Pursuant to a vote of the majority stockholders of a manufacturing corporation, all of its property and assets were transferred to a son of its vice president and another, who in payment gave their notes for the exact amount of the company's indebtedness. Further carrying out the plan under which the transfer was made, a new corporation was organized with a capital stock of $50,000, to which the purchasers transferred the property, receiving therefor an agreement to assume and pay the debts of the old company, and also one-half the stock of the new company; its articles of incorporation reciting that the property was of a value $25,000 greater than such indebtedness. The stock so received was divided between majority stockholders of the old company and the son of its vice president, who together acquired the controlling interest. Complainants, who were dissenting minority stockholders owning more than one-fourth of the stock, were given no interest in the new company. There was other evidence tending to show that the value of the property in excess of the indebtedness of the old company was at least $25,000. *Held,* that complainants were entitled to recover their proportionate share of such value

from the new company and the majority stockholders of the old who became stockholders therein, but that certain other stockholders who voted with the majority but did not become stockholders in the new company were not liable therefor.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 686–690; Dec. Dig. § 182.*

Rights of minority stockholders as to management of corporate affairs, see note to Wheeler v. Abilene Nat. Bank Bldg. Co., 89 C. C. A. 482.]

.3. CORPORATIONS (§ 182*)—TRANSFER OF PROPERTY—DUTY OF MAJORITY TOWARD MINORITY STOCKHOLDERS.

Majority stockholders of a corporation occupy a fiduciary relation toward the minority, and, in authorizing a transfer of corporate property to themselves or to another corporation in which they are interested, are subject to the settled rule that trustees will not be permitted, to the detriment of their cestuis que trustent, to purchase and hold the trust property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 686–690; Dec. Dig. § 182.*]

4. CORPORATIONS (§ 182*)—LIABILITY TO STOCKHOLDERS—WRONGFUL DISPOSITION OF PROPERTY.

A corporation, which through its regular corporate agencies, by a transfer of its property, wrongfully deprives some of its stockholders of the value of their stock, is liable therefor on the same principle that would hold it liable in case of its wrongful refusal to transfer stock on its books.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 686–690; Dec. Dig. § 182.*]

Appeal from the District Court of the United States for the Northern Division of the Eastern District of Michigan; Alexis C. Angell, Judge.

Suit in equity by Bliss Stebbins, Earl Card, and Richard S. Woodliff against the Michigan Wheelbarrow & Truck Company and others. Decree for defendants, and complainants appeal. Reversed.

For opinion below, see 191 Fed. 238.

This was a suit brought by appellant Stebbins, as a stockholder in the Michigan Wheelbarrow & Truck Company, a corporation of Michigan, in behalf of himself and all other stockholders who were similarly situated and might desire to join in the proceeding; and the other appellants, Woodliff and Card, were permitted later to intervene as co-complainants. Complaint was made against an executed transfer of all the company's assets, subject to its debts, to another Michigan corporation, the Saginaw Wheelbarrow Company, which was organized for the purpose of receiving the transfer; and the defendants below were these two corporations and also certain stockholders whose names are given in the margin,[1] and their relations to the companies and holdings are stated in the opinion. The transfer had been executed and delivered by a majority of the directors, with the consent of a majority in number and interest of the stockholders, of the old company; and the object of the suit was to secure the appointment of a receiver, an accounting, the winding up of the affairs of the old corporation, a sale of the corporate assets and discharge of the liabilities, and a money decree representing the value of complainant's proportionate share in such assets. Issue was joined through joint answer of the defendants and a replication. The defendants avoided a ruling upon the motion for appointment of a receiver for both companies, and also secured authority for the new company to continue to manufacture and dispose of its

---

[1] George A. Alderton, Melvin O. Robinson, August C. Melze, M. W. Tanner, Fred J. Fox, James S. Smart, Thomas Jackson (who died pending the suit and as to the deceased the suit was revived in the name of his executrix, Ruth Jackson), Harker W. Jackson, and Alfred A. Alderton.

product in the ordinary course of business (subject, however, to a require-ment fully to account to the court), by proffering a bond, which, under sanc-tion of an order of the court, was given in the sum of $25,000 to the com-plainant, Stebbins, and conditioned to perform any decree that might be ren-dered in his favor. Trial was had below on a vast amount of evidence, pre-sented through depositions and exhibits, which resulted in a dismissal of the bill; and the complainants appeal. The decision below is reported in 191 Fed. 238, where the facts as there found fully appear.

Dayton W. Closser, of Alpena, Mich. (J. H. Cobb, of Alpena, Mich., of counsel), for appellants.

R S. Woodliff, of Detroit, Mich., in pro. per.

Weadock & Weadock, of Saginaw, Mich., for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge (after stating the facts as above). We concur in large measure in certain of the conclusions of fact reached by the learned trial judge, but we are not able to affirm his ultimate conclusion or the decree. The basis of the decree is that at the time of the transfer the assets of the old company were worth nothing in excess of its debts. The implication is that, if there had been a material excess in value, complainants would have been en-titled to recover their respective shares in the form of a money de-cree. It is true that, in spite of the unusual quantity of evidence of-fered,[2] it is impossible, as the court below in substance observed, to ascertain with exactness the net value of the corporate assets at the time of the transfer; and yet the volume of business the old com-pany evidently obtained and conducted, even down to the date of the transfer, the nature and quantity of assets it possessed, coupled with the acts and admissions of the individual defendants, impel us to believe that the assets were materially greater in value than the amount of the debts; and that the minority interest was unduly de-nied opportunity to share in such value. It is also true that the ad-ministration of the principal complainant as manager of the old com-pany and his conduct as its secretary were not calculated to inspire confidence in his associates; and it is not surprising that the com-pany dispensed with his services. But his shares of stock with those of his co-complainants, at the time of the transfer, admittedly con-stituted more than one-fourth of the entire capital stock of the old company; and we pass by the contention persisted in between coun-sel respecting Stebbins' inefficiency before his dismissal, his refusal to renew indorsements for the company, and his efforts thereafter to aid a competing company, instead of the old one, with the observa-tion that neither criticism of his conduct nor efforts to justify it as-sist in solving the ultimate problem of the case. The property in-terests of the minority remained and could not be appropriated by the majority upon any such theory.

The old company was incorporated in January, 1900, for the pur-poses of the "manufacture and sale of wheelbarrows, trucks, and

[2] The printed record alone comprises 2938 pages, and there are besides a large number of exhibits not printed.

other kindred articles," with a capital stock of $25,000, which was increased in September, 1901, to $50,000. Both of these amounts, $25,000 each, appear to have been subscribed for and paid in cash. The original capital seems to have been substantially consumed in obtaining land, constructing necessary buildings, and acquiring equipment; and still the increase was not sufficient to supply the necessary working capital. Resort was had to loans which were obtained upon indorsements of the company's paper by four of the principal stockholders, who were also directors, including complainant Stebbins. In August, 1904, the paper so indorsed amounted to about $70,000. An agreement was then entered into binding these four directors, with four other stockholders, in separate amounts, to hold the indorsers harmless to the extent of $50,000 in the event of their having to pay any of such notes, or their renewals, for a period of one year; and the obligations so entered into were secured by the deposit of certain of their individual securities with one of their number, George A. Alderton, as trustee. That agreement was subsequently extended for a further term of two years; that is, until August 22, 1907. Thus, if we include the capital paid in, at least $120,000 appears to have been received by the company and applied to its plant and business. At different times it was deemed necessary by those in charge of the company to obtain additional capital by the issue of preferred stock or mortgage bonds, or to consolidate with some kindred company; but their efforts in these respects failed. The company becoming dissatisfied with Stebbins as secretary and manager, dismissed him, and in July, 1905, procured the services of Thomas Jackson as manager. Mr. Jackson, an experienced manufacturer in another line, placed his son, Harker W. Jackson, in immediate control of the Michigan Company's business.

It is needless to set out all the steps taken to bring about the sale subsequently made. The testimony is in conflict touching the methods adopted by the majority interest, that is, whether sufficient efforts were made to sell the property to strangers, whether the nominal buyers were the real purchasers, whether the purchase price was as much as might with reasonable effort have been obtained; in short, whether the sale was not in truth the execution of a scheme arbitrarily to eliminate the non-consenting minority interest. It is not worth while to try to reconcile all the phases of this conflict. It is certain that, within a few months after Stebbins was replaced by Jackson as manager, the corporate property was conveyed and transferred by the Michigan Company to Harker W. Jackson and Alfred A. Alderton, the former the son, as stated, of the manager of that company and the latter the son of one of its directors and principal stockholders; and it is not pretended that these grantees were either financially able or that they expected to make the purchase upon their own account. The sale was at last based upon an affirmative vote representing 3,100 shares, while the negative vote represented 1,300 shares.[3] The deed conveying the realty bears date December 28, 1905,

[3] The stockholders voting and their shares were as follows: A. C. Melze, 1,000 shares; G. A. Alderton, 500 shares; J. S. Stewart (Smart), 100 shares;

and the consideration named is nominal. The instrument transferring the goods, chattels, book accounts, etc., bears the same date and recites a consideration of $52,942.42. However, the entire consideration is disclosed by the plan, which, as shown by the minutes of the old company and the evidence, was employed to turn over the property and assets of the old company to the new one. The sale followed a report to the stockholders of a committee of officers and directors of the old company, viz., August C. Melze, president; George A. Alderton, vice president; and M. O. Robinson, secretary. This report in terms shows the entire consideration to have been $73,884.91, the exact amount of the company's debts. This sum was to be payable in the purchasers' negotiable demand notes running in favor of the old company, with interest at 6 per cent.; and, as was stated in the committee's report, these notes were to be "indorsed by two or more indorsers that shall be satisfactory to the board so that the same can be discounted without recourse to the company at their face value." The notes, bearing date January 3, 1906, were signed by the two purchasers, and indorsed by M. O. Robinson, A. C. Melze and G. A. Alderton, the members of the committee just mentioned, and were turned over to the old company; and these indorsements derive further significance from what followed.

Three days later (January 6th), articles of association of the Saginaw Wheelbarrow Company were signed by Thomas Jackson and the two purchasers of the property of the old company. On the same day these purchasers conveyed to the new company the realty which they had received from the old company; the consideration named here, like that in the deed of the old company, being nominal. We do not find in the record any instrument transferring the personalty to the new company, but it certainly was delivered to that company. Harker W. Jackson having his attention called to the notes given as stated to the old company, in the aggregate sum of $73,-884.91, testified in respect of them:

"It was understood between the stockholders of the wheelbarrow company and Alfred Alderton and myself that these notes would be surrendered after the new company was organized on condition that the stockholders of the new company, the Saginaw Wheelbarrow Company, would assume the debts of the old company."

One of the articles of association of the new company states the amount of its capital stock ($50,000) and the fact that it was paid, one half in cash and the other half in property. This property is classified and described and is the property so conveyed and transferred by the old company; and immediately succeeding the description and the total value affixed, this appears: "Less an indebtedness which this company assumes, * * * $73,884.91." The new company seems to have obtained credit immediately upon its organization, and it might be inferred from some of the testimony that this was through the financial standing of some of its stockholders. Its capital stock consists

F. J. Fox, 100 shares; M. W. Tanner, 400 shares; and M. O. Robinson, 1,000 shares—total 3,100 shares, the complainants' combined holdings being 1,300 shares. The remaining 600 shares were not voted.

of 5,000 shares. Thomas Jackson and his son appear by the articles of association to have subscribed each for 900 and Alfred A. Alderton for 3,200 shares; but it is to be observed. that Alfred A. Alderton's holdings were subsequently diminished to 350 shares, and that M. O. Robinson, A. C. Melze, and G. A. Alderton became possessed of 2,151 shares, which, with Thomas Jackson's holdings, gave to these four men a majority of the total number of shares. We stop to mention that others of the old stockholders, though none of the complainants, also received different amounts of the new stock, .among them M. W. Tanner, who received 340 shares. He was one of the directors of the old company and joined with Melze, Robinson, and G. A. Alderton in bringing about the sale of the old company's property. The new company was then able to and it did take up the notes of the old company held by banks in Saginaw to the amount of $69,-500, which, as already stated, had been indorsed by four of the directors (Robinson, Melze, G. A. Alderton, and Stebbins), and the indorsers in turn indemnified by an agreement and collaterals deposited with G. A. Alderton, as trustee. The new company then turned these notes over to Harker W. Jackson and Alfred A. Alderton, who exchanged them for the purchase-money notes which they with their indorsers had given in payment for the old company's property, as before pointed out; whereupon G. A. Alderton, as trustee, returned the collaterals securing the indemnity agreement to the respective owners. Thus the transition from the old to the new company was effected without the payment of any money, except such as was required to pay stock subscriptions in the new company; but, as respects every ordinary object of holding stock in the old company, the protesting minority stockholders were eliminated. The record abundantly justifies a conclusion reached by the court below:

"It is quite clear that this plan of financing the new company was worked out before its actual organization was completed, and that some, at least, of the stockholders (indorsers) of the Michigan Company's notes expected to become indorsers for and stockholders in the new company."

However, the degree of credit before alluded to which the new company at once obtained is not attempted to be explained upon the theory, certainly not alone upon the theory, that it was able to secure indorsements of its commercial paper; and granting its ability in this behalf, still the reason for this is hardly to be accounted for by the cash it received upon stock subscriptions, if in truth the company derived no profit through the purchase of the property of the old company. And this brings us to a consideration of the value of the old company's assets.

Foremost among the evidential features which tend to show such value is the admitted fact that in organizing the new company the value of the old assets was fixed at $25,000 in excess of the indebtedness. We have seen that the new company's capital stock of $50,000 was declared in its articles of association to have been "actually paid in"; that is, $25,000 had been paid in cash, and the rest ($25,000) by the excess in value of its property over its indebtedness. This representation was made specific by stating the total value of the prop-

erty to be $98,884.91, and the total indebtedness to be $73,884.91, and so showing a balance equal to one half the capital stock. It is insisted that this excess in value was due to the payment of the other half in cash; but the fallacy of this may be seen in the obvious result that would have been attained if all the money, instead only of a substantial part, had been used to reduce the indebtedness. In that event (if it be assumed that before the receipt of the money the value of the assets and the amount of the indebtedness were equal), it is true it could have been said that the value of the assets exceeded the indebtedness to that extent; but that would not have been because the value of the assets had been increased, but because the indebtedness had been reduced; neither would the primary liability on the capital stock have been discharged. Nor was there any other method of using this money both to discharge its equivalent in any sort of corporate obligations and transmute the old assets into an augmented value equal to the sum of the indebtedness and the money; either such surplus value existed before, or it was not there later. We are not unmindful of the influence which this amount of money might ordinarily have upon the business activities of such a company; but, when this newly organized company (as it was at the date of this valuation) is compared with some of the pertinent features of the old company, the beneficial effect of such a sum in cash could not have been very material as respects increment in value of the corporate assets apart from the money itself. For example, the old company was so conducted as to be able to discount its bills. This was done by the plan before described of employing the indorsements of four of the directors for banking purposes; and it must not be forgotten that, in spite of Stebbins' refusal to sign renewal notes for the old company, he was liable under the agreement, secured by his collaterals with others, to indemnify the very indorsers who were disposing of the company's assets, and this agreement had been extended to a time more than eighteen months beyond the date of the sale. Besides, the official control of the old company had been for nearly six months practically the same as that proposed for and carried out later in the new company.

Furthermore, the representation as to value contained in the articles of association is strengthened by the fact that the directors and stockholders of the old company, who either carried out or sanctioned the preconcerted plan of a new company, became stockholders in that company and the larger holders officially connected with its management. Also, pursuant to statutory requirement the old company made annual reports to the Secretary of State, in 1901 and to and including 1905, showing its condition on the 1st day of January of each year. These reports were each signed by a majority of the directors and sworn to by one of their number as secretary. Moreover, in 1902 and to and including 1905, reports were made to the old company itself, showing its condition on July 1st of each year. In each of the foregoing reports, the net value of the company's assets was reported to be more. some years much more, than the net value represented in the articles of association of the new company. In 1904 the Ameri-

can Appraisal Company, of Milwaukee, was employed at the instance of Melze and G. A. Alderton to make an appraisement of the buildings, machinery, and equipment of the old company. The appraisal company appears to have given both the reproductive and depreciated values. Based upon these depreciated values and values that were at least acquiesced in by the company (on July 1, 1904) respecting assets not so appraised, the difference between the value of the company's assets and the sum of its indebtedness shows a net value of more than twice that fixed in the articles of association of the new company. It is to be observed, however, that on November 30, 1905, Harker W. Jackson made a report to the stockholders of the old company containing the old estimates of value and the debts, in which the net value of the assets was fixed at $23,101.07. The report also showed the value of the company's assets according to his own estimate, and, deducting the debts, the net value was fixed at $2,934.09.

It must be conceded, in respect of the reports to the Secretary of State and the old company, that much forceful criticism has been made by counsel. We are bound under the evidence to recognize a tendency in companies, for purposes of credit, to exaggerate their financial conditions in making their annual reports to the Secretary of State. We are not so much impressed, however, concerning the reports made to the old company, which, until after the rupture that culminated in the present suit, were apparently considered by some of the principal stockholders and directors. It is difficult to conceive of either motive or reason on the part of such men to deceive themselves. We cannot attach much importance to the report made by Harker W. Jackson. That report was made at the stockholders' meeting of November 30, 1905, within a month of the sale; and it must be said of it that Jackson failed in his testimony to give any convincing reason for the large reduction he made in the value of the assets. His valuation was, moreover, fatally inconsistent with the estimate, which, in the articles of association of the new company, he shortly afterward represented to be the true value; and his valuation of November 30th cannot be explained except through his apparent zeal to exclude Stebbins and secure an interest in the business through the plan now under review. And in spite of objections urged against the appraisement of the American Appraisal Company respecting some mistakes it seems to have made, its agencies engaged in the work were at least disinterested, and allowance for these mistakes cannot change the result.

The company never paid but one dividend, and the profit so implied was for the most part rather artificial than real; and although losses were suffered, yet they were incurred under circumstances that render them of little aid in determining the value of the assets. Some of those who took part in bringing about the transfer of the old company's property, among them Alfred A. Alderton, succeeded later in purchasing a number of shares of the old stock at prices varying from 10 cents to 33⅓ cents on the dollar; but naturally sales made under the conditions then existing would not reflect the true value of the stock; and the evidence does not show that the stock ever had a mar-

ket value. Testimony given by defendants concerning the value of the assets must be weighed with the effect that attaches to their treatment of the official and other reports and representations of value, to which attention has been called.

[1] Further allusion to the range of considerations embraced in the question of value is not necessary. The parties had ample opportunity to present evidence; and, plainly under the defense that the value of the assets was materially less than the indebtedness, an issue was presented which placed upon the defendants the burden of proof. Meeker v. Winthrop Iron Co. (C. C.) 17 Fed. 48, 51, opinion by Circuit Judge Baxter; Robotham v. Prudential Insurance Co., 64 N. J. Eq. 673, 712, 53 Atl. 842; Wilkinson v. Bauerle, 41 N. J. Eq. 635, 645, 7 Atl. 514; Coombs v. Barker, 31 Mont. 526, 545, 79 Pac. 1; the instant case being distinguishable from the decision of this court in Rothchild v. Memphis & C. R. Co., 113 Fed. 476, 51 C. C. A. 310, because the sale of the railroad there involved was made under judicial approval and order. The defendants clearly failed to discharge this burden; and upon the whole evidence we conclude that, at the time the assets of the old company were taken over by the new company, their net value, that is, the value over and above the indebtedness, was as much as $25,000, and so equaled one-half the par value of the entire capital stock.

[2] Manifestly this distinguishes the instant case from that of Thoman v. Mills, 159 Mich. 402, 124 N. W. 33, relied on by the court below. The natural inference, indeed the only rational one deducible from the evidence, is that (in order to avoid friction and obtain fresh working capital) there was a preconcerted design to get rid of Stebbins. It hardly need be added that this design was carried into execution without offering to complainants an opportunity to participate in the new enterprise. However, the circumstances of the case do not incline us to believe that the directors and stockholders who brought about the sale and in effect replaced their stock in the old company by stock in the new were conscious of their true relations and duties either to the company or the minority stockholders. Of the five directors of the old company, four sanctioned the sale to and obtained stock in the new company, viz., Melze, president, G. A. Alderton, vice president, M. O. Robinson, secretary, and M. W. Tanner. They jointly owned and voted 2,900 shares in the old company, a clear majority; Smart and Fox, who held the remainder of the majority shares, each voted his holdings of 100 shares in favor of the sale; Melze, G. A. Alderton, M. O. Robinson, and M. W. Tanner each became holders of stock, and two of them, Melze and Robinson, became directors, in the new company, but Smart and Fox sold their shares in the old company, as stated later, and did not obtain shares in the new company. Thomas Jackson, who was general manager of the old company and entitled to 500 shares therein (although at the time of the sale he had not received them, as hereinafter pointed out), became a stockholder in the new company and its president; Harker W. Jackson, who was assistant to his father as manager of the old company, also became a holder of stock in and the vice presi-

dent of the new company; and the shares in the new company acquired by the directors of the old, with the shares of the Jacksons, constituted a large majority of its entire capital stock.

[3] Considering these facts, in connection with the contested transaction, it needs only to be said of the majority directors and stockholders in the old company, as also of Thomas Jackson, that their relations and duties to that company and the minority stockholders were strictly fiducial. They concerned the very essence of the corporate power, indeed, the practical wrecking of the corporation itself through the sale of its entire property; and, since these men both sold and in effect bought the property, their acts cannot for a moment stand the test of the long-settled rule that trustees will not be permitted, to the detriment of their cestuis que trustent, to purchase and hold the trust property.[4] The cases relied on by defendants, like Town v. Bank of River Raisin, 2 Doug. (Mich.) 530, and Bank v. Salt & Lumber Co., 90 Mich. 345, 51 N. W. 512, are not applicable. The corporation in each of those cases was confessedly insolvent. Further, those decisions do not, as evidently they could not, proceed upon the idea that a majority interest might rightfully appropriate to their separate use and benefit surplus assets of their company in total disregard of the rights of the minority stockholders. The case thus also falls easily within the rule laid down by the present Mr. Justice Lurton in Rogers v. Nashville, C. & St. L. Ry. Co., 91 Fed. 299, 313, 33 C. C. A. 517, 531 (C. C. A. 6th Cir.):

"But the majority shareholders will not be permitted to use this power of control for the purpose of obtaining advantages for themselves at the expense of the minority, and, when an unfair and oppressive contract is shown, a case is made which will authorize interference on behalf of the injured minority."

It follows that, in accordance with the issue and theory upon which the case was presented and tried touching a money decree, the complainants are entitled to recover sums equal to 50 per cent. of the par value of their several shares in the Michigan Wheelbarrow & Truck Company, with interest thereon at 5 per cent. per annum from January 6, 1906 (the date of taking over the property), until the date of the allowance of the decree; that is to say, Bliss Stebbins upon 940 shares, Richard S. Woodliff upon 300 shares, and Earl L. Card upon 60 shares—the face value of the shares being $10 each. We are disposed to believe, however, that a decree should not go against the defendants Fox and Smart. While it is true, as stated, that they voted in favor of the sale, yet they do not appear to have participated

---

[4] Wheeler v. Abilene Nat. Bank Bldg. Co., 159 Fed. 391, 89 C. C. A. 477, 479, 485, and note, 16 L. R. A. (N. S.) 892, 14 Ann. Cas. 917; Backus v. Brooks, 195 Fed. 452, 454, 115 C. C. A. 334 (C. C. A. 2d Cir.); Jones v. Missouri-Edison Electric Co., 144 Fed. 765, 771, 75 C. C. A. 631 (C. C. A. 8th Cir.); Jackson v. Ludeling, 21 Wall. 616, 622, 624, 22 L. Ed. 492; Smith v. Smith, Sturgeon & Co., 125 Mich. 234, 239, 84 N. W. 144; Chicago Hansom Cab Co. v. Yerkes, 141 Ill. 320, 333, 30 N. E. 667, 33 Am. St. Rep. 315; Cook v. Berlin Woolen Mill Co., 43 Wis. 433, 439, 445; Goodin v. Cin. & Whitewater Canal Co., 18 Ohio St. 169, 182, 98 Am. Dec. 95; Hallam v. Indianola Hotel, 56 Iowa, 178, 180, 9 N. W. 111; Maas v. Lonstorf, 194 Fed. 577, 584, 114 C. C. A. 419 (C. C. A. 6th Cir.).

in any design to appropriate or get any benefit from shares of the minority. On the contrary, they sold their stock for less than its real worth to Alfred A. Alderton, who thus, through his holdings in the new company, placed himself in a position to enhance the benefits he sought under the transaction in dispute. Alfred A. Alderton and Harker W. Jackson, of course, received their stock in the new company with full knowledge of the nature of the transaction. Thomas Jackson, since deceased, received 500 shares of his stock in the new company as a gift. This was by reason of an arrangement previously entered into between him and the old company, under which he was to receive that number of the old shares in part payment for his services as its general manager. In receiving the assets of the old company through the agencies employed to bring about the transfer, the new company was chargeable with full knowledge of the facts attending the so-called sale. Jones v. Missouri-Edison Electric Co., 144 Fed. 775, 776, 75 C. C. A. 631.

[4] The allowance of a decree against the old company presents some difficulty and seemingly will be of little value; yet we content ourselves with the view that the company's liability for the wrongful act, committed through the corporate agencies mentioned, of depriving complainants of the value of their stock, cannot in principle be effectively distinguished from the familiar rule of imposing upon a corporation liability for the value of shares of its stock where it wrongfully refuses to transfer them on its registry. London, Paris & American Bank v. Aronstein, 117 Fed. 601, 605, 54 C. C. A. 663 (C. C. A. 9th Cir.); Dooley v. Mines & Milling Co., 134 Iowa, 468, 471, 109 N. W. 864, 13 Ann. Cas. 297; Lewis v. Bidwell Electric Co., 141 Ill. App. 33, 35; 2 Cook on Corp. (7th Ed.) §§ 389, 392, 581, et seq., and citations.

The decree below is reversed, with costs, save that Earl L. Card will, under the order allowing his intervention, be denied recovery of costs "incurred up to and including the final decree" entered below and now under review; and the cause is remanded, with direction to enter a decree against all the appellee-defendants, except Fred J. Fox and James S. Smart, in conformity with this opinion.