# THE CHICAGO HANSOM CAB COMPANY

*v.*

## CHARLES T. YERKES.

*Filed at Ottawa March 24, 1892.*

1. CORPORATION—*director authorized to sell corporate property can not become its purchaser.* A director of a private corporation, whose duty it is to preserve the corporate property and protect the company against loss, so far as that can be done by the exercise of ordinary care and diligence, can not become the purchaser of any of the corporate property which it has become his duty to sell.

2. A trustee is disqualified to act by the intervention of a personal interest in the performance of his duties as trustee. He can not obtain title to property in respect of which he has a duty to perform inconsistent with the character of a purchaser.

3. It is a general rule, administered by courts of equity, that when one person has the power of disposition of the property of another without the consent of the latter, he shall not be allowed to become personally interested in it himself,—and this without regard to any question of fairness in the immediate transaction,—for the reason he will not be allowed to occupy a position where self-interest may tempt him to a betrayal of duty.

4. SAME—*improper sale by directors—how avoided.* Where it appears that the directors of a corporation are under the control of a purchaser of its property, so that a demand on them to bring suit to avoid the sale would be unavailing, a bill to set aside such sale may be brought in the name of a stockholder.

5. SAME—*power of holder of majority of the stock.* The holder of a majority of stock in a corporation may, when the law authorizes a vote of stockholders, so vote upon any matter of policy in the conduct of the corporate affairs as best to subserve his own interests,—and this may relate to the winding up of its business and the sale of its property; but even in such cases the action resulting from such vote must not be so detrimental to the corporation itself as to lead to the necessary inference that the interests of the majority of the shareholders lie wholly outside of and in opposition to the interests of the corporation and of the minority of the shareholders, and that their action is a wanton or a fraudulent destruction of the rights of such minority.

6. After it is determined to wind up a corporation and settle its business, it is not competent for a holder of a majority of its shares of stock to make or ratify a sale of all the corporate property to himself,

against the protest of a holder of a minority of its shares, and in disregard of his rights.

7. SAME—*majority of stockholders can not appropriate the corporate property to their own use against objections of minority.* In winding up the business of a corporation, the majority of the stockholders can not take the property of the corporation and retain it to their own use, against the objection of the minority. If they do so, the minority may elect to treat the majority as purchasers, and, as such, to require them to account for the value of the property. The right of a majority of the stockholders to sell the corporate property does not include the right to seize such property for their own use, which is the case when the majority of the stockholders sell to themselves.

8. SAME—*stockholders selling the property of the corporation to themselves—how sale may be set aside.* It is illegal and fraudulent for the majority of the stockholders to purchase the property of the company at a sale authorized by themselves. Such a purchase may be set aside in the same way and to the same extent that a purchase of corporate property by a director may be set aside.

9. JOINT POWERS—*conferred on two can not be exercised by one—disqualification of one disqualifies both.* A resolution of the stockholders of a private corporation appointing the president and secretary a committee to mortgage or sell all or part of the corporate property, with authority to sign, seal and deliver any mortgage, deed or bill of sale necessary, confers on such committee a special power, requiring the exercise of judgment and discretion, which can not be exercised by one, only, and if one of them is disqualified from acting, neither of them can act.

10. A director of a corporation, who was also its secretary, made a contract with a third person to purchase the stock of the company, and thus acquire control of its property, after which the majority of the stockholders, in their interest, passed a resolution that a committee, consisting of the president and secretary, be appointed to mortgage or sell all or part of the corporate property, in their discretion, under which they made a sale to such third person, who advanced the money, and the property was conveyed to a person other than the purchaser, who sold the personal property to the director, according to the previous contract : *Held,* that the power of sale could not be exercised by one, only, of the committee, and that, the director being disqualified from acting on the ground of his interest being inconsistent with his duty to the company, neither could act, and that the sale was voidable by any stockholder not consenting thereto or not ratifying the same.

11. RATIFICATION—*who may effect.* Whether in any case a ratification is effective, depends upon whether those assuming to ratify might have legally authorized the act to be done in the first instance.

21—141 ILL.

12. PURCHASER—*under contract between others—affected by existing equities.* Where money is furnished by one under a contract made between others, by which he becomes the purchaser of property, he will take subject to such contract, and the acts done under the same, and will be affected by all equities against such contract.

APPEAL from the Circuit Court of Cook county; the Hon. LORIN C. COLLINS, Judge, presiding.

Charles T. Yerkes, a stockholder of the Chicago Hansom Cab Company, filed his bill in chancery in the Cook circuit court against that company, Warren Springer, Rose Abernethy, and others, to have a sale and conveyance of real estate and personal property of the company to said Rose Abernethy declared void, and set aside, and for an injunction and the appointment of a receiver. A temporary injunction was issued and a receiver appointed, as prayed. Answers were filed to the bill, putting in issue its material allegations. By consent of parties, before the hearing, the receiver was directed by the court to inventory the personal property. An appraiser was appointed to assess the value of the personal property, and it was further decreed that the property should thereafter be turned over to Rose Abernethy upon her giving bond,— all of which was done. Upon final hearing, Yerkes filed, by consent of court, a supplemental bill to wind up the corporation and sell the real estate, apply the proceeds to the payment of the corporate debts, and distribute any surplus there might be, after such payment, among the stockholders. The court decreed as prayed in the original and supplemental bills, and Springer and Abernethy appeal from that decree.

The facts deemed material to the questions discussed in the opinion are, in brief, these: The Chicago Hansom Cab Company was organized in 1884, under the general law, as a corporation, for the purpose of carrying on the business of the transportation of persons and property by hansom cabs and other vehicles drawn by animals, in Cook county, and carried on this business from the time of its organization

until in 1889. Its capital stock was $100,000, divided into one thousand shares of $100 each. It acquired the real estate in controversy for a cab barn soon after its organization, and immediately thereafter erected a cab barn thereon, and it acquired the cabs, horses, harness, and other personal property now in controversy, for the transaction of its business, as that business from time to time required. The business of the company proved unprofitable. The company became largely indebted, some of which was reduced to judgment and others of it was secured by mortgage upon the company's property. All of the stockholders were in favor of closing up the affairs of the corporation. A meeting of the stockholders was called, at the instance of Yerkes, for the 13th of April, 1889, to consider the feasibility of selling off the property and closing out the business of the company. At that meeting Yerkes was instructed, by resolution, to consult with an attorney as to the proper and legal way to close the business of the company, and to report to an adjourned meeting at 2:30 o'clock P. M. on the then following Monday, (April 15, 1889,) and it is proved at that time Yerkes requested Needham to inform all of the stockholders that he would sell his stock or purchase the stock of the other stockholders for thirty-five cents on the dollar.

On the evening of the 13th of April, 1889, C. A. Needham commenced negotiations with Warren Springer, as Needham testified, first informing him that he had a speculation which he thought would pay, which resulted in their entering into the following agreement in writing before the meeting of the stockholders at the adjourned meeting on the 15th of April, namely:

"This agreement, made April 15, 1889, between Warren Springer, party of the first part, and Charles A. Needham, party of the second part:

"*Witnesseth,* that said parties mutually agree to purchase the stock of the Chicago Hansom Cab Company, and thus

obtain control of its property, real and personal, and then to pay the debts of and wind up the affairs of the said company and divide the property of the same, as hereinafter provided. To accomplish this, the said first party agrees to furnish the sum of $60,000 to purchase said stock and pay the debts of said company,—$35,000 to purchase the stock of said company and $20,000 to pay the debts of said company, except two judgments, one in favor of Sophia Havlick, for the sum of $3500, and one in favor of John McCarthy, for the sum of $1500, and to pay said judgments in case they or either of them shall be affirmed, with interest. Second party agrees to furnish the money required to pay all of the debts of said company and to purchase the stock of the same, except that above agreed to be furnished by first party.

"It is further agreed that said stock shall be bought in the name of . . . . . . . . . . . . . ., and duly and legally transferred to the said first party, to be held by him as security for the money advanced by him to purchase said stock and pay said debts, till the division of said property, as hereinafter provided. When said stock shall have been all acquired and said debts paid, as aforesaid, it is mutually agreed that the real estate belonging to said company, consisting of seventy-five feet front on Clinton street by one hundred and fifty feet deep, and now occupied as the barn and office of said company, shall be deeded to the party of the first part, free and clear of all liens and incumbrances except the judgments above mentioned, and that all the personal property now belonging to said company shall be legally and properly transferred to said second party.

"It is mutually agreed that said Needham shall have the right to carry the appeals already taken from said judgments, to the Appellate Courts or Supreme Court, if he shall see fit so to do, he agreeing to pay all costs and expenses of the same. In case said judgments, one or both, shall be affirmed, the said first party agrees to pay the same, with interest, but if either one or both shall be defeated and said company

saved from liability on account of the same, then the amount saved shall be divided equally between the parties hereto, the expense from this time being first paid by said Needham.

"Said second party agrees that at the time said personal property is transferred to him, he will make, execute and deliver to the said first party his three notes for $5000 each, payable on or before eight, sixteen and twenty-four months after date; and as a part of the purchase price of said personal property, and payment for the aid given by said first to said second party in settling the affairs of said company, said second party agrees that if said notes of $5000 are not paid within those dates, he will pay to said first party the sum of one and one-half per cent per month upon the amount unpaid, as liquidated damages." Said second party also agrees to make, execute, acknowledge and deliver to said first party, to secure his said notes and agreement, a chattel mortgage upon the entire amount of said personal property, and to insure the same in the sum of $15,000 for the benefit of said first party, and keep the same so insured until the said notes are paid.

"It is mutually agreed that said second party shall have the bills receivable, cash on hand, and the earnings of said company, until said property shall be divided, and that he shall have the right to sell fifty hansom cabs, twenty harnesses and forty horses for such prices and upon such terms as he shall see fit, said Needham agreeing to turn over the avails of said sale, except the sum of $2500, to the said first party to apply on said notes. Said Needham guarrantees that the debts of said company do not exceed $23,000, exclusive of said judgments. Until said personal property is transferred, said second party is to pay said first party the sum of $300 per month for rent of said real estate, from date thereof."

This was signed and sealed by Springer and Needham. Before the making of this contract the stock of the company was owned as follows: Charles T. Yerkes, 375 shares; A. B. Pullman, 265 shares; William M. Van Nortwick, 100 shares;

Edward Leger, 30 shares; George L. Dunlap, 100 shares; N. L. Jones, 50 shares; J. W. Cotton, 60 shares; Walter Flagg, 5 shares; Anderson, 5 shares; J. N. Cutler, 10 shares.

At the time the stockholders' meeting was held, on the 15th of April, Needham had bought up all the certificates of shares of stock except those standing in the names of Yerkes and Pullman, having paid Springer's money therefor, and Pullman had at that time given Springer an option for the purchase of his stock at thirty-five cents on its par value, for which Springer paid him, through Needham, $1000, and he was finally paid in full therefor by Needham, for Springer, on the 8th day of May, following. By Springer's direction 290 of the shares of stock so purchased by him were transferred to Kirk Himrod, and 30 of them were transferred to Thomas A. Haggerty, under previous agreements between Springer and those parties that they should hold such shares for him. On the 6th of May, 1889, the original certificates of stock were taken up and cancelled, and new ones were issued in lieu thereof, directly to Himrod and Haggerty. The directors of the company elected in January, 1889, for the ensuing year, were Albert B. Pullman, William M. Van Nortwick, J. W. Cotton, Charles A. Needham and Charles T. Yerkes, and Albert B. Pullman was elected its president and treasurer, and Charles A. Needham its secretary, for that year.

At the adjourned meeting of the stockholders, held on the 15th of April, the record of the meeting shows there were present, Yerkes, Pullman, Needham, Van Nortwick and Leger. Yerkes was then ignorant of the contract that had been made between Springer and Needham, and of the purchases of stock that had been made by Needham for Springer, pursuant thereto. Yerkes made a report to those present, that he had obtained legal counsel, and submitted the opinion of that counsel, to the effect, in substance, that while the corporation might sell its property and from the proceeds pay its debts, it was more advisable that it should be closed up by decree of court,

upon bill in equity, pursuant to the statute. Pullman at that meeting offered to buy the stock of Yerkes at thirty-five cents of its par value, and to pay him $15,000 at the time. The money was furnished by Springer for the purpose of buying the stock, and Pullman was acting as his agent in making the offer, though this fact was not at the time known to Yerkes. Yerkes declined the offer, and refused to sell his stock. No action was taken at the meeting on the 15th of April in regard to a sale of the property.

On the 20th of April, 1889, a special meeting of the board of directors of the company was held, at which was adopted a resolution requesting the president to call a meeting of the stockholders of the company "to consider the condition of the company, and determine what course it is best to pursue under the circumstances." Accordingly a meeting of the stockholders was called for May 4, 1889, which was adjourned until May 6, 1889. At that meeting, stockholders and proxies representing all the stock of the company were present, as follows: Pullman, 265 shares; Cutler, 10 shares (by Pullman); Yerkes, 375 shares (by Furbeck); Himrod, 290 shares; Haggerty, 30 shares; Cotton, 30 shares (by Himrod, proxy.) The record of that meeting shows the adoption of the following resolution by the vote thereon as indicated:

"WHEREAS, the object of this meeting being to devise ways and means to raise money to meet the indebtedness of this company, and as part of this indebtedness is past due and must be met at once; therefore be it

"*Resolved*, That a committee, consisting of the president and secretary, be appointed to mortgage or sell all or part of the property of the company, at their discretion, and be authorized to sign, seal and deliver any mortgage, deed or bill of sale necessary, and to report at an adjourned meeting, May 8, at 2:30 P. M., at the same place.

"The following was the stock voted for or against said resolution: In favor of same,—Cutler, 10 shares (by A. B. Pull-

man); Pullman, 265 shares; Himrod, 290 shares; Cotton, 30 shares (by Himrod); Haggerty, 30 shares,—total 625 shares. Against said resolution,—Yerkes, 375 shares (by Furbeck, proxy.)

"There being a majority the resolution was carried, and there being no other business, meeting adjourned to Wednesday, May 8."

Yerkes was not present at the meeting, but was represented there by Furbeck, his proxy, who, by direction of Yerkes, voted the stock of Yerkes against the adoption of the resolution.

At the adjourned meeting held on the 8th of May the record of its proceedings is as follows:

"Adjourned meeting of stockholders, held Wednesday, May 8, 2:30 P. M.   All stock was represented, as follows:   Pullman, 265 shares; Cutler, 10 shares (by proxy, Pullman); Yerkes, 375 shares (by Furbeck); Himrod, 290 shares; Cotton, 30 shares (by Himrod); Haggerty, 30 shares (by Himrod) —total, 1000 shares.

"Meeting called to order by Pullman.   Minutes of last meeting read and approved.   Secretary then read report of committee appointed on May 6 by the stockholders, as follows:

" '*Report of A. B. Pullman, president, and Charles A. Needham, secretary :*

" 'Under instructions contained in a resolution passed at stockholders' meeting held May 6, and knowing it was the wish of all the stockholders that the business of the company be immediately closed, we have to report that we have sold the real estate of the company, consisting of the property where the stables are now located, for the sum of $40,000 in cash, and have received the money therefor, less the amounts of incumbrances and liens thereon, which the purchaser has assumed and agrees to pay; less, also, the sum of $14,500, for which a certified check has been given and placed in the hands of a third party, to be handed to us as soon as the first mortgage, which has been paid, is released, there being no record

to show that same has been released, although said $14,500, and interest, has been paid. And we have also sold the personal property of the company for the sum of $20,000, and received cash therefor; that the debts of the company amount to the sum of $10,540.38, exclusive of liens on said real estate; that checks have been prepared and signed to pay the debts of said company and the amounts coming to the stockholders. We have acted thus because we know it to be the wishes of the stockholders that the business of the company be closed.'

"The secretary then handed around the checks and vouchers for inspection. Mr. Himrod offered the following resolution:

" '*Resolved,* That the foregoing report be approved and in all respects ratified; and further resolved, that the business of this company be declared ended, and the president and secretary are authorized and requested to pay the debts of said company, and divide the moneys left *pro rata* among the stockholders, and that the books and papers remain in the hands of the secretary.'

"The president having put the above resolution, it was voted for as follows: For—A. B. Pullman, 275 shares; Kirk Himrod, 350 shares,—total, 625 shares. Against—C. T. Yerkes, 375 shares. Resolution declared carried."

The sale was made to Springer and Needham, Springer furnishing the money, but by direction of Springer the real estate was conveyed to Rose Abernethy, his niece, and the bill of sale for the personal property was also made to her, but both the deed for the real estate and the bill of sale of the personal property were delivered to Springer. Those instruments were executed by Pullman, as president, and Needham, as secretary, of the company, and dated May 6, 1889. After the 8th of May, 1889, Needham ran the business that had formerly been carried on by the Chicago Hansom Cab Company, under a lease executed by Rose Abernethy, by Warren Springer, her attorney in fact.

At a special meeting of the board of directors of the company, held on June 8, 1889, their record shows as follows:

"Special meeting of directors, pursuant to notice of meeting, at 10 A. M., at parlor 23, Grand Pacific Hotel, to receive and act upon resignations of directors; to fill vacancies, investigate accounts, receive and act upon reports concerning condition of the company and its property, including report of committee appointed January 12, 1887, and appoint a new committee; to receive report upon matters named in resolution of stockholders adopted May 6, 1889; to decide upon future conduct of the company, and transact such further business as shall come before the meeting; copy of notice mailed to each director at least two days previously. Directors Pullman, Van Nortwick and Needham present.

"President authorized to employ counsel to defend suit of C. T. Yerkes *v.* Chicago Hansom Cab Company and others.

"Resignation of director Cotton, and election of Kirk Himrod as director, who takes his seat.

"Resignation of director Van Nortwick, and the election of Thomas A. Haggerty as director.

"Resolution introduced by Mr. Himrod, reciting the resolution adopted January 7, 1889, introduced by Charles T. Yerkes, and advice of Yerkes at meeting of April 15, 1889, to close up business of company and immediate sale of its property, and valuation by him at less than $60,000, with other reasons suggested by him for closing business; reciting resolution of April 20, 1889, and action of meetings of stockholders held May 4, May 6 and May 8, 1889, above given; reciting that the directors believe that the sale of the real estate and personal property was made in good faith, and for the largest and best price which could be obtained, and it being for the best interests of the stockholders to close the business of said company, and resolving that the sale so made and reported by the president and secretary be ratified and confirmed, and that the action of said committee and said stockholders' meet-

ing in appropriating proceeds of the sale to the payment of debts, and the treasurer in paying proceeds, be in all respects ratified and confirmed. The foregoing resolution unanimously adopted."

The present bill was filed on the 24th of May, 1889, and therefore before the foregoing meeting was held. The resolution above set out was prepared by Springer, and offered by Himrod, under his directions.

Messrs. MILLER, STARR & LEMAN, for the appellant:

The action of the stockholders authorizing this sale was sufficient authority therefor, without the action of the board of directors. *Hull* v. *Glover*, 126 Ill. 122; *Sawyer* v. *Printing Co.* 77 Iowa, 242; *Berry* v. *Broach*, 21 Eng. & Am. Corp. Cas. 347; *Treadway* v. *Manufacturing Co.* 7 Gray, 393; *Lauman* v. *Railroad Co.* 30 Pa. St. 42; Morawetz on Corp. secs. 337, 413, 474, 512; Cook on Stock and Stockholders, sec. 625; Beach on Private Corp. sec. 73; *Eidman* v. *Bowman*, 58 Ill. 446; *Railway Co.* v. *Allerton*, 18 Wall. 233.

The ratification by the board of directors supplied any lack of authority in the stockholders in ordering the sale.

Messrs. GOUDY, GREEN & GOUDY, for the appellee:

The power to dispose of the property of the corporation was vested in its board of directors. Cook on Stock and Stockholders, sec. 709; *Gashwiller* v. *Willis*, 33 Cal. 11.

Directors can not deal, directly or indirectly, with the corporate property, and the corporation has the absolute right to repudiate such a transaction. Cook on Stock and Stockholders, sec. 653; *Wardell* v. *Railroad Co.* 103 U. S. 651; *Abbott* v. *Hard Rubber Co.* 33 Barb. 578.

As to the right of the majority of the stockholders to sell the corporate property, on objection by the minority, see *Gamble* v. *Queens County Co.* 123 N. Y. 91.

It is illegal for the majority to purchase the corporate property at a sale authorized by themselves. Cook on Stock and Stockholders, sec. 656; *Menier* v. *Telegraph Works*, L. R. Ch. App. 350; *Meeker* v. *Iron Co.* 17 Fed. Rep. 48; *Ervin* v. *Navigation Co.* 20 id. 577; *Gregory* v. *Potchett*, 33 Beav. 595; *Brewer* v. *Boston Theater*, 104 Mass. 378; *Reilly* v. *Oglebay*, 35 W. Va. 36; *Goodwin* v. *Canal Co.* 18 Ohio St. 169.

When a corporation will not act, a stockholder not assenting may act, and a demand is not necessary when it would be unavailing. Morawetz on Corp. sec. 242; Pomeroy's Eq. Jur. sec. 1095.

Mr. Justice Scholfield delivered the opinion of the Court:

From the foregoing statement it is clear that when Needham entered into the contract with Springer, the former was a director in the Chicago Hansom Cab Company, and its secretary. As director he owed the duty to the company to preserve its property and protect the company against loss, so far as that could be done by the exercise of ordinary care and diligence, and he could not himself become the purchaser of any property of the corporation which it was his duty to sell. (*Wardell* v. *Railroad Co.* 103 U. S. 651.) The contract between Needham and Springer requires the purchase of all the property of the cab company, and the subsequent transfer of the personal property to Needham. It is an entire and indivisible contract, and Needham is therefore directly interested in every part of the claimed contract of sale by the company to Springer.

But it is claimed the authority to make this sale is derived from a vote of a majority of the stockholders. That vote was given at the stockholders' meeting on the 6th of May, 1889, in these words: "Therefore be it resolved, that a committee, consisting of the president and secretary, be appointed to mortgage or sell all or part of the property of the company, at their discretion, and be authorized to sign, seal and deliver any mortgage, deed or bill of sale necessary, and to report at

an adjourned meeting, May 8, at 2:30 P. M., at the same place." This required the exercise of judgment and discretion by both the president and the secretary, and, being a special power, it could not be exercised by one, only; (Perry on Trusts, sec. 413; *Hartford Fire Ins. Co.* v. *Wilcox*, 57 Ill. 180;) and so, necessarily, if one was disqualified to act, neither could act. The resolution of the stockholders invested Needham, as well as Pullman, with a special confidence and trust, which required that he should act solely with a view to the best interests of all the stockholders. But he was disqualified to thus act by reason of his previous contract with Springer, which gave him a personal interest to be promoted by his action under the resolution. The rule is familiar that a trustee is disqualified to act by the intervention of a personal interest in the performance of his duties as trustee. He can not obtain title to property where he has a duty to perform inconsistent with the character of a purchaser on his own account. *Borders* v. *Murphy et al.* 125 Ill. 577.

It is, however, contended, that this sale was ratified by a vote of a majority of the stockholders at their meeting on the 8th of May. Whether, in any case, a ratification is effective, depends upon whether those assuming to ratify might have legally authorized the act to be done in the first instance. At the time this vote was taken, Springer either really owned or had contracted to purchase, and by virtue thereof was entitled to and did control, a majority of the shares of stock,—indeed, all except those owned by Yerkes; and so, upon the record of the meeting of the 8th of May, the names and votes of Pullman, Himrod, Haggerty, Cotton and Cutler, being the votes in favor of the ratification of the sale, are but another form of expressing the name and votes of Springer in favor of it. The question is therefore presented, whether, after it is determined to wind up a corporation and settle its business, it is competent for a holder of a majority of its shares of stock to make or ratify a sale of all its property to himself, against

the protest of a holder of a minority of its shares, and in
disregard of his rights.

That a holder of a majority of the shares of stock in a
corporation may, where the law authorizes a vote of stock-
holders, so vote, upon any matter of policy in the conduct of
the corporation, as to best subserve his own interests, and
that this may relate to the ceasing to do corporate business,
the winding up of its affairs and the sale of its property, we
do not question.    But the authorities cited by counsel for
appellant (*Gamble* v. *Queens County*, 123 N. Y. 91, and *Trans-
portation Co.* v. *Beatty*, L. R. 12 App. Cases, 589,) concede that
even in such cases the action resulting from such vote must
not be so detrimental to the corporation itself as to lead to
the necessary inference that the interests of the majority of
the shareholders lie wholly outside of and in opposition to the
interests of the corporation and of the minority of the share-
holders, and that their action is a wanton or a fraudulent
destruction of the rights of such minority.   In the cases cited,
and, so far as we are informed, in all other cases where the
majority of the stockholders may by their votes lawfully affect
the interests of the minority of the stockholders, the interests
of the minority are, theoretically at least, protected either by
directors or trustees of the corporation, who it will not be
presumed will betray their trust by acting in the interest of
one stockholder to the prejudice of another, or by reason of
the transaction being such as is presumed to be alike bene-
ficial to all stockholders,—as, where the corporate property
is in good faith appropriated to the payment of the corporate
debts, or is sold at a fair sale; and no case cited or within
our knowledge goes to the extent of holding that a majority
of the stockholders may take the property of the corporation
and retain it, if the minority shall elect to deny its right to
acquire title to it in that way.   Undoubtedly, if in such case the
minority of the stockholders shall elect to treat the majority
as purchasers, they may do so, and require them to account

for the value of the property. Here, Springer, who through Pullman, Himrod, Haggerty, Cotton and Cutler assumes to ratify this sale, is the same Springer who with Needham is the purchaser of the property,—in other words, he assumes to ratify a sale to himself. But a man can not be both buyer and seller in the same transaction, and where he assumes to be such, his action simply amounts to a taking of the property, and would be quite as valid without as with the circumlocution of the form of a sale through dummies.

The right of a majority of the stockholders to sell the corporate property can by no reasonable construction be held to involve the right to seize the property to their own use. A sale conducted, as it must be, fairly and openly, can not, theoretically, operate to the prejudice of one stockholder more than to another. There is in such case no presumptive antagonism between the different stockholders. But where, under pretense of a sale to themselves, the majority seize the property and undertake to invest themselves with title, their interests are wholly hostile, for the gain of the one is the loss of the other.

It is a general rule, administered by courts of equity, that where one person has the power of disposition of the property of another without the consent of that other, he shall not be allowed to become personally interested in it himself,—and this without regard to any question of fairness in the immediate transaction,—for he shall not be allowed to occupy a position where self-interest would tempt a betrayal of duty. This rule is plainly applicable here, and it has been so applied in adjudicated cases. It is said in Cook on Stockholders, sec. 656: "It is illegal and fraudulent for the majority of the stockholders to purchase the property of the company at a sale authorized by themselves. Such a purchase by the majority may be set aside in the same way and to the same extent that a purchase of corporate property by a director may be set aside." See, also, Bigelow on Frauds, (vol. 2, p. 645,)

where it is said, "no act of the majority can purge the fraud" of appropriating the common property to their own benefit by any portion of the corporators; and to like effect is the ruling in *Meeker* v. *Winthrop Iron Co.* 17 Fed. Rep. 49, and *Ervin* v. *Oregon Railroad and Navigation Co.* 20 id. 577; and see, also, *Menier* v. *Hooper's Telegraph Works*, 9 L. R. Ch. App. Cases, 350; *Brewer* v. *Boston Theater,* 104 Mass. 378; *Preston* v. *Grand Collier Dock Co.* 11 Sim. 327; *Hodgkinson* v. *N. L. S. Ins. Co.* 26 Beav. 473; *Atwood* v. *Merryweather*, L. R. 5 Eq. 464, and note.

The action of the board of directors on the 8th of June, as affecting the validity of the sale, is not, under the pleadings, properly before us for consideration. Counsel for appellant are mistaken in saying, as they do, that appellee in his supplemental bill relies upon it. The allegation of the supplemental bill to which reference is made, is this, only: "Your orator further shows, that a majority of the stockholders of said corporation having resolved to discontinue the business of said corporation, the directors of said corporation, since the filing of said bill, have ratified such action of the majority of the stockholders." There is no reference whatever to the sale of the property. "Such action" means, plainly, the resolution to discontinue the business of the company.

We think it unimportant whether the money furnished by Springer, and used by Needham in purchasing the stock of the corporation and in paying for the property claimed to be purchased from it, was that of Rose Abernethy, as said by Springer at the time he began negotiating with Needham, or whether, as the evidence strongly tends to prove, it was in fact that of Springer, for in either view the money was furnished and used, as is shown, in performance of the contract between Needham and Springer, and Rose Abernethy can therefore only take subject to that contract, and she must be affected by whatever has been done by Needham and Springer to acquire title to the property.

It appears from the evidence that the directors of the corporation were in the interest and under the control of Springer, so that a demand upon the corporation to bring suit against him would have been unavailing, and the suit is therefore properly brought by Yerkes. *Chicago* v. *Cameron*, 120 Ill. 447.

We are unable to perceive any sufficient reason for reversing the decree below. It is therefore affirmed.

*Decree affirmed.*