Katharine W. Long, Appellant, v. Wilson Stove and
Manufacturing Company et al., Appellees.
James B. Wilson, Appellee, v. Wilson Stove and Manu-
facturing Company and Katharine W. Long, Ap-
pellant.

58

Opinion filed January 5, 1934. Rehearing denied October 22, 1934.

CHARLES C. GRASSHAM and H. A. EVANS, for appellant.

ROY R. HELM and CHARLES E. FEIRICH, for appellees Wilson Stove & Mfg. Co. et al.

George Eigel, for appellees Susan Gray Wilson et al.

L. R. Stewart, for appellee James B. Wilson, complainant in cross-bill.

Mr. Justice Murphy delivered the opinion of the court.

This case was tried in the circuit court of Massac county and appealed to the Supreme Court and that court transferred the record to this court.

The questions presented on this record arise out of an attack made by a minority stockholder of the Wilson Stove & Manufacturing Company, an Illinois corporation, upon certain proceedings leading to a voluntary sale of the largest part of the assets of said corporation and the sale of a part of those assets to James B. Wilson, who was at the time of the sale a stockholder, director and president of the corporation, and the sale of another part of the assets to Vlasta Klimt who was not a stockholder.

The property involved in the sale was free of lien, and at the time of the sale the company was solvent and no rights of creditors are involved. The corporation was not indebted to either of the purchasers at the sale.

The Wilson Stove & Manufacturing Company was originally founded in St. Louis, Missouri, in 1894 with an original investment of six or seven thousand dollars. It was engaged in the manufacture of stoves, principally wood heaters. In 1916 the offices and factory were moved to Metropolis, this State, and on January 1, 1917, began operation there. James Wilson, the father of the litigants who are principally interested in this case, was the original founder and was president and actively engaged in its management until his death in 1927. After his death the stock he owned in the

corporation, which was the major part, was divided between his two daughters, Katharine W. Long and Susan Gray Wilson, and his son, James B. Wilson. The capital was $450,000, representing 4,500 shares of $100 par value, each, and after the division of the stock among the heirs of James Wilson, the ownership of all the stock was as follows: Katharine W. Long 991 shares, Susan Gray Wilson 1,500 shares, James B. Wilson 1,500 shares, Stephen H. Long 507 shares, Ernest L. Cox two shares. Stephen H. Long is the husband of Katharine W. Long. After the division of the stock, the officers and directors of the corporation were James B. Wilson, director and president, Stephen H. Long, director, vice president and treasurer, and Ernest L. Cox, director and secretary. The corporation was operated as a family affair with the cares of its management and operation resting principally upon James B. Wilson and Long. The by-laws provided for stockholders' meeting and for regular monthly meetings of the board of directors, but no regular called meetings were held until 1932. If matters arose which necessitated a record, James B. Wilson and Long decided the matter, a record was made and all stockholders signed the minutes of the purported meeting. This practice continued until the company met with severe financial losses. The company met with a good degree of financial success from 1917 to 1929. During that period its net profits, after allowing for depreciation and payment of dividends, ranged from $8,648.18 in 1929 to $77,455.68 in 1917. Every year within this period showed a profit, except the year 1921 when there was a loss of approximately $50,000. The financial depression which the witnesses fix as taking its worst form in October, 1929, took its toll in the following years and the loss for each year was approximately as follows: 1930, $38,000; 1931, $98,000; 1932, $54,000. There is no charge in this record that any part of these

losses was caused by inefficient or improper management on the part of the directors or officers.

Prior to January, 1932, the directors had consulted efficiency engineers as to the best methods to pursue to stop the losses and one plan was to enlarge the method of distribution. Charles G. Schott was employed as general sales manager for that purpose. The losses continued, and on January 2, 1932, the stockholders held a meeting to discuss the financial condition of the company and to work out a plan for future action. Stephen H. Long attended this stockholders' meeting, representing his own stock and his wife's. It does not appear that he held any power of attorney to vote her stock but he did vote it and she subsequently approved the action taken by signing the minutes of the stockholders' meeting. The financial condition of the corporation was fully discussed, James B. Wilson leading the discussion, and one plan involved the advancement by the stockholders of $150,000 to $175,000 as working capital. On vote this was unanimously defeated. The other plan involved the liquidation of the assets of the corporation and Stephen H. Long offered a resolution which, after reciting that in view of the losses already sustained and likely to be sustained, provided, "that it would therefore be necessary and desirable to liquidate to the best advantage the assets of the company, and the Board of Directors are authorized to conduct negotiations to this end to the best of their ability." This resolution was unanimously adopted. Following the adoption of this resolution Wilson and Long, on behalf of the corporation, employed Schott to assist in the sale. His directions from the directors were rather indefinite and vague, but it seems that the purpose of his employment was to contact prospective buyers in this and other States, and if they appeared interested he was to report the matter to the directors and they would endeavor to arrive at a purchase price

and terms of sale with the prospective purchaser. Schott was thus employed from January until in August and during that time contacted 60 or more officers of corporations, or individuals, engaged in the manufacture of stoves or similar products in various parts of the country. In August, 1932, he reported to Wilson and Long that he could not effect the sale and asked for further instructions. Susan Gray Wilson, a stockholder, was at that time in California. On August 27th Wilson and Long both participated in the preparation of a letter to her, stating that it appeared impossible to sell the corporate assets as a whole and that some other alternative would have to be selected, and asked that she come for a stockholders' meeting. Later in this opinion we shall have occasion to discuss in more detail the events, as they occurred, between the date of the letter, August 27th, and the stockholders' meeting on November 15th.

At the time of the stockholders' meeting on November 15th, the ownership of the stock was the same as hereinbefore stated, except that in October preceding, Susan Gray Wilson had assigned two shares of her stock to Schott. All persons owning stock were present at this meeting with the exception of Susan Gray Wilson and Schott held her proxy dated October 24, 1932, to vote her 1,498 shares. This meeting had been called pursuant to a resolution of the board of directors held on October 29th, at which meeting directors Wilson and Cox voted for the resolution, Cox being absent. The resolution of the board of directors provided for calling of a special meeting of the stockholders to be held on November 15th, for the purpose of holding a meeting for the election of directors, "the stockholders having neglected and failed to hold the annual meeting for an election of directors in accordance with the by-laws," and for discussing, considering, acting upon and establishing of a procedure, plan

or method to make effective a resolution passed at a meeting of stockholders on January 2, 1932, providing for the liquidation of the corporate assets, and for the purpose of liquidating of the assets in accordance with the statute, and for passing such resolutions as were necessary for carrying out the plan or procedure adopted. Notice was given to each stockholder by mail, which notice stated the purpose of the meeting as aforesaid.

Upon the convening of the meeting the first action taken was the election of directors and resulted in the election of James B. Wilson, Long, and Schott. Immediately following, Schott offered the resolution hereinafter set forth. Wilson seconded its adoption and the vote upon the adoption of the resolution was: 3,509 shares for and the 991 shares owned by Mrs. Long present and not voting. James B. Wilson and Schott voted all their votes for the adoption of the resolution. The resolution is as follows:

"Resolution

"Be it resolved by the stockholders of Wilson Stove & Manufacturing Company, a corporation:—

"That the Directors of Wilson Stove & Manufacturing Company shall at once and without delay, proceed to make effective a resolution adopted at the meeting of the stockholders on January 2, 1932, providing for the liquidation of the corporation's assets.

"That the Directors of Wilson Stove & Manufacturing Company shall at once and without delay, proceed to sell all the corporate assets of the corporation (excepting cash, bills and accounts receivable and stock in Columbia Stove Company).

"That the Directors of Wilson Stove & Manufacturing Company shall at once and without delay, proceed to make an inventory of the assets of the corporation (excepting cash, bills and accounts receivable and stock

in Columbia Stove Company). This inventory shall show substantially all assets of the corporation, (except as above stated) but not in minute detail and shall be substantially in the following groups:

"Group 1. Real Estate, being land and improvements thereon, situated in Massac County, Illinois.

"Group 2. Patterns, including followboards, sand matches and core boxes; flasks, bottom boards, tight boxes and jackets; Trade Marks, Patents, Machinery, Equipment, Raw Materials, Manufactured stock.

"Group 3. Real Estate being land and improvements thereon, situated in Massac County, Illinois, patterns, including followboards, sand matches and core boxes, flasks, bottom boards, tight boxes and jackets, Trade Marks, Patents, Machinery, Equipment, Raw Materials, Manufactured stock.

"Group 4. Real Estate, being land and improvements thereon, situated in St. Louis County, Missouri.

"That the Directors of said Wilson Stove & Manufacturing Company shall, at once and without delay, proceed to sell all of the above mentioned assets of said corporation (excepting cash, bills and accounts receivable and stock in Columbia Stove Company), to the highest bidder or bidders.

"That notices of said sale, showing the above inventories, time, place and terms of sale, shall be sent by the President or Secretary of Wilson Stove & Manufacturing Company to all persons, firms or corporations, who are known to them to be interested in the purchase of any group or groups or combination of those groups.

"That any stockholder or director or officer of Wilson Stove & Manufacturing Company, knowing of any person, firm or corporation, who might be interested in the purchase of any group or groups or combination of said groups shall give the name of such person, firm or corporation and the correct address to the Pres-

ident or Secretary of Wilson Stove & Manufacturing Company, who shall send to such person, firm or corporation a notice of the time, terms and conditions of sale and an invitation to submit a bid or bids thereon.

"That any stockholder, Director or Officer or Employee of said Wilson Stove & Manufacturing Company shall have the same right as any other bidder or bidders to bid on any group or groups or combination of said groups.

"That bids shall be submitted in writing, in sealed envelopes and shall be mailed or delivered to Mr. Henry J. Humma, President of the First National Bank, Metropolis, Illinois.

"That bids shall be received up to and not later than 12 o'clock noon, central standard time, Jan. 17, 1933.

"That bids can be submitted on groups 1 and 2 separately or on a combination of groups 1 and 2 identified as group 3.

"That individual bids only will be permitted on group 4 as bids on this group will not be considered in combination with any other group or groups.

"That a certified check for twenty per cent (20%) of the amount of each bid shall accompany each bid; with this proviso, if the bidder bids on one or more groups or permitted combination of groups, he shall attach to each group bid a certified check for twenty per cent (20%) of the amount of that bid, and then to bid on permitted combination of groups he shall attach a certified check for an amount, which, added to the amount of the check or the amounts of the checks attached to a bid or bids for a group or groups will aggregate or total twenty per cent (20%) of the amount bid on permitted combination of groups.

"That said certified checks shall be made payable to Wilson Stove & Manufacturing Company.

"That bids shall be opened at 2 o'clock P. M., on Tuesday, the 17th day of January, 1933, in the Di-

rectors' room of the First National Bank, Metropolis, Illinois, in the presence of such bidders who choose to be present.

"That the assets of Wilson Stove & Manufacturing Company (excepting cash, bills and accounts receivable and stock in Columbia Stove Company) shall be sold to the highest bidder or bidders.

"That all bids shall be listed and the highest bid in each of the four (4) groups shall be designated as the highest bid for said group.

"That if the individual high bids in the aggregate on groups 1 and 2 exceed the high bid on group 3 then the several respective high bids on the respective groups 1 and 2 shall be accepted.

"That the high bid on group 4 shall be accepted.

"That in the event no bid is received on group 2 then the right is reserved to reject the bid on group 1 unless satisfactory arrangements can be made with the bidder and purchaser of group 1 for the storage of the property listed in group 2 until such time as the property listed in group 2 can be sold. This is the only exception and the high bids on groups 1, 2, 3 and 4, shall absolutely be accepted.

"That in the event no bid is received for any group or groups permitted combination of groups are not sold at the time and place hereinbefore fixed, any of the groups or permitted combination of groups not sold at said time shall be sold by the Directors who are directed and authorized, and empowered to then at once and without delay proceed to sell any such group or groups or combination of groups by any lawful means and at any time and in any lawful manner that the Board of Directors may decide upon and to then at once and without delay proceed to sell any such group or groups, or combination of groups without any further authorization whatsoever on the part of the stockholders.

"That after the opening, examining and listing of bids, the Directors shall declare who are the highest bidders and notify them in writing at once. The successful bidders shall within ten (10) days from that date pay an additional thirty per cent (30%) in cash, thus making a payment of a total of fifty per cent (50%) in cash prior to the removal of any part of the group or groups purchased or the occupancy of the premises or taking any possession whatsoever, the remaining fifty per cent (50%) shall be paid at that time in cash or by the execution of a note or notes payable one-fourth (¼) semi-annually over a period of two (2) years from date bearing six per cent (6%) interest per annum, payable semi-annually, said note or notes to be payable to the Wilson Stove & Manufacturing Company, the same to be secured by collateral other than by a mortgage or lien on the assets purchased and the collateral must be high grade, have a good market and shall be acceptable in all respects to the Board of Directors of Wilson Stove & Manufacturing Company.

"That certified checks of unsuccessful bidders shall be returned to said unsuccessful bidders without delay.

"That failure on the part of successful bidders to pay the remaining thirty per cent (30%) cash within the time specified and to execute note or notes and deposit collateral acceptable to the Board of Directors within ten (10) days from and after January 17, 1933, shall work a forfeiture of their respective twenty per cent (20%) cash deposits, which shall be retained by the Wilson Stove & Manufacturing Company as liquidated damages.

"That bidders who are successful shall remove property listed in group 2 on or before March 1st, 1933, unless satisfactory arrangements are made with the purchaser or purchasers of the lands and buildings or with the Wilson Stove & Manufacturing Company, in

the event the land and buildings are not sold, to permit said property to remain in said building longer.

"That possession of land and buildings shall be given to the purchaser or purchasers on or before March 1st, 1933.

"That the President and Secretary of Wilson Stove & Manufacturing Company are hereby authorized, directed and empowered to execute Warranty Deed or Deeds to the purchaser or purchasers and to execute proper bills of sale to purchasers of personal property.

"That immediately upon acceptance of bids the President and Secretary are authorized, empowered and directed to execute the necessary and requisite affidavits with reference to the Bulk Sales Law of Illinois.

"That the President and Secretary and Directors are authorized, empowered and directed to do whatever and all that is necessary to be done in the carrying out of the above mentioned plan, method and procedure, and shall proceed with the sale of the assets of said Wilson Stove & Manufacturing Company, as hereinbefore set forth, at once and without delay. That as soon as said sale or sales have been consummated and the assets, including bills and accounts receivable and stock in Columbia Stove Company, have been reduced to cash or to cash and notes and the debts have been paid, the President and Secretary and Directors are directed, authorized and empowered to make a distribution of cash to the stockholders and to endorse and deliver to the stockholders of said corporation any and all promissory notes and all collateral securing the same, the said endorsements and assignments to show and indicate the respective and undivided interest or part in each note that each stockholder shall have and complete and full distribution of cash and notes shall be made to the stockholders according to their respective rights and interests.

"That as soon as said distribution has been made of cash and notes to stockholders, or, in connection with said distribution the President and Secretary and Directors are directed and empowered and authorized to take the necessary legal steps to dissolve the corporation and surrender its Charter."

Soon after the adoption of the resolution the directors prepared an inventory of the property as described in the resolution and the property was grouped in accordance therewith. Invitations to bid were prepared by the directors and were mailed to persons, firms or corporations whom anyone interested in the corporation might think a prospective bidder. It was mailed to about 300 different firms, persons or corporations.

There were but two bids filed; that of James B. Wilson for $15,000 for properties listed as groups 1 and 2 and a combination of them as group 3, and one by Henry Cornet filed in the name of Vlasta Klimt for $4,500 for group 4, or the St. Louis property.

Immediately following the opening of the bids, Schott and Wilson, as directors, declared the two bids received to be the highest bids and directed notice to be given to each bidder of that fact. James B. Wilson and Schott, as directors, wrote a letter to James B. Wilson notifying him that his bid was the highest, and similar notice was given to Vlasta Klimt.

On the fourth day following the opening of the bids Katharine W. Long filed her bill of complaint in the circuit court of Massac county against Wilson Stove & Manufacturing Company, Susan Gray Wilson, James B. Wilson, Charles G. Schott, Stephen H. Long, Cornet & Zeibig and Vlasta Klimt. By her bill she alleges the organization of the corporation, the ownership of the stock, the directorate and officers of the corporation; that the corporation is solvent, and that James B. Wilson and Charles G. Schott unlawfully conspiring together for the unlawful purpose of bene-

fiting themselves and freezing out the complainant and her husband and Susan Gray Wilson of their interest in such corporation and acquiring the property for their own use and benefit, determined to bring about a forced sale by throwing the same upon the market at a forced sale and to acquire it themselves for a mere pittance and nominal part of its value; sets out the resolution of November 15, 1932, and avers that the same was passed over her protest and opposition; that the corporation is wholly under the management and control and domination of Wilson and Schott, they being the majority of the board of directors and owning or voting a majority of the shares of the stock and that it would be unavailing and futile for her to request or demand the said corporation to institute an action in its name for a cancellation of this bid or to prevent a sale by said corporation to said bidders; that the adoption of said resolution was fraudulent and void in that it purported to authorize James B. Wilson, who was then president and director, to purchase for his own personal benefit and gain in violation of his trust and duty toward the stockholders of the company at a greatly inadequate price when it must have been known to him that such property could not be sold on the market for anything like its present value; that no notice was given to the general public for bids by publication in local papers, metropolitan papers or trade journals of this or any other State; that the invitation to bid was a pamphlet in book form, setting forth the nature of the property to be sold, which was sent to persons who were supposed to have an interest in the purchase of such property; that group 4, the St. Louis real estate, was no part of the company's plant or used in connection with the business of said company; alleges the filing of said bid by James B. Wilson of $15,000 for groups 1, 2 and 3 which comprise the whole plant and its property lo-

cated at Metropolis; that said resolution contemplated competitive bidding, but when there was but one bid it could not be said to be the highest bid because it was also the lowest bid; that there was no cause or compelling circumstances that necessitated the sacrifice of this property and that she will suffer irreparable loss in income, property rights and the value of her stock if the cancellation of said sale is not perfected.

The prayer of the bill is that the court will cancel the bids of James B. Wilson and Vlasta Klimt for their respective tracts; that the corporation be restrained from consummating the sales to Wilson and Klimt, and that Wilson and Klimt be permanently enjoined and restrained from further taking possession of said property; that the company be restrained from a sale of the property to Wilson and Klimt, and that a receiver be appointed to take charge of and conserve all property and to sell the same either at public or private sale, providing an adequate bid can be obtained, and if it cannot be readily sold on the market at the present value that it be preserved and protected until such time as it can be sold at a reasonable and adequate price, and upon sale being made the proceeds thereof, after the payment of the costs, be apportioned to the several stockholders in proportion to the ownership of their stock.

An answer to the bill of complaint was filed for and on behalf of the corporation, James B. Wilson, as director and president of the corporation and in his individual capacity; Charles G. Schott, as secretary and director, and as agent of Susan Gray Wilson and in his individual capacity. By answer it was admitted that the stock was owned as alleged in the bill; that the corporation was solvent, but denied any unlawful conspiracy between Wilson and Schott to acquire the property of the corporation for their own benefit; admitted the passage of the resolution November 15,

1932, and denied that it was any part of a scheme originated by Wilson and Schott to acquire the property of the corporation; denied that the resolution was passed over the protest of the complainant, but avers that the complainant was present and did not vote either in favor of it or against the resolution; denies that the corporation is wholly under the management of Wilson and Schott; admits that the sale was not advertised in any newspaper; admits the filing of the bid by Wilson and Klimt, and sets up the steps that were taken to prevent further losses as hereinbefore set forth, and alleges that the complainant did not furnish co-operation in said corporate matters.

James B. Wilson filed a cross-bill covering the same matters set up in the answer and made the corporation and Katharine W. Long parties defendant, and prayed that the bid of $15,000 be decreed to be the fair cash value of the property as covered by the bid; prays the court to enter a decree approving the bid and directing specific performance on the part of the corporation and directors, and that the board of directors be directed to prepare a proper conveyance for the real estate and personal property, and that Katharine W. Long be permanently enjoined from asserting and claiming any interest in said property so purchased by the cross complainant.

On behalf of the corporation an answer was filed to the cross-bill admitting most of the allegations of the cross-bill, and admitted that if the bid was determined to be a valid bid, that deeds and instruments of conveyance should be made.

An answer to the bill of complaint was filed on behalf of Cornet & Zeibig and Vlasta Klimt who neither admitted nor denied the charges of fraud and conspiracy, but alleged that the bid made in the name of Vlasta Klimt for $4,500 was made in good faith and was all that the property was worth.

Susan Gray Wilson filed her separate answer to the bill of complaint, admitting the ownership of the stock in the corporation; denied the charge of fraud and conspiracy and alleged her consent to the acceptance of the bids submitted if they are proven to be the highest bids filed.

The answer of Katharine W. Long to the cross-bill of James B. Wilson admits all matters appearing by the corporation record and denies all allegations of lack of co-operation by her or Stephen H. Long.

After a hearing before the court a decree was entered finding the organization of the company, the ownership of the stock, the solvency of the company, the passage of the resolution and the filing of the bids as alleged in the original bill; that the corporation had sustained losses, and that it was to the best interests to liquidate its assets; that there was no fraud, conspiracy or collusion by James B. Wilson and Charles G. Schott; that the bids were adequate and represented the fair cash market value of the property, and ordered that the original bill be dismissed for want of equity, and the prayer of the cross-bill granted, directed that the corporation within 30 days from that date make, execute and deliver to James B. Wilson, a conveyance of the real estate owned by the corporation at Metropolis and transfer to him the personal property, all to be done upon his payment of the balance of the purchase price, and that similar conveyance be made to Vlasta Klimt, and that Katharine W. Long be enjoined and restrained from asserting or claiming any interest in the property so sold.

Katharine W. Long perfects this appeal, and defendants Wilson Stove & Manufacturing Company, James B. Wilson, Charles B. Schott, Susan Gray Wilson, Cornet & Zeibig, Vlasta Klimt and James B. Wilson, as cross complainant, each appearing by their respective solicitors, join in the same brief and argument in this court.

For a proper consideration of the questions involved it will be necessary to consider, in addition to the facts already stated, the evidence (1) upon the valuation of the property, (2) upon the attitude and conduct of the parties in their negotiations leading up to the adoption of the resolution for a sale of the property.

There is a conflict in the evidence upon the valuation of the property and we will first consider the evidence on value as it relates to the real and personal property located at Metropolis. The foundry site consisted of 14 acres, upon which there was a three-story brick building; one-story frame building, one-story brick foundry and mill room, a two-story brick cupola room, a one-story brick nickel plating shop, one-story crate shop and various other small buildings. All of the buildings have an aggregate floor space of 158,000 square feet. The oldest buildings were erected in 1916, and the remainder within three or four years thereafter at an aggregate cost in excess of $140,000.

Included in group 2 is an inventory of patterns listed under 63 different headings; under many of these headings are a large number of items. In said group 2 there is an inventory of raw materials, floor flasks, tight boxes, jackets, bottom boards, machinery, equipment and manufactured articles all running into innumerable items and including all stock in trade, supplies and equipment used in the operation of said plant.

Eight witnesses testified for appellant on the valuations of the Metropolis property. The ones who gave their opinion as to the fair cash market value of all the property fixed it at from $50,000 to $100,000. Two witnesses testified as to the value of the buildings and fixed it at $50,000, and the third gave it as his opinion that they were worth $80,000. One witness who testified as to the value of the stock in trade, and the parts used in the foundry work, fixed the value at $15,000.

One witness who testified as to the value of the steel bars, stove bolts, etc., fixed it in excess of $3,000. One witness testified that the foundry site, without any buildings or improvements, was worth from $150 to $300 per acre.

There was but one testified for appellant as to the value of the St. Louis property included in group 4, and he fixed it at $45,000.

On behalf of appellees nine witnesses testified as to valuations, three of them stating that in their opinion the building site and plant had no market value, and another fixed the value of the grounds and buildings at $10,000. One witness who gave his opinion as to the value of the inventoried property, group 2, fixed it at $5,500. One witness, engaged in the wrecking of buildings, estimated that the cost of clearing the site would be from $6,000 to $8,000, and that there would be no value in the salvage. James B. Wilson fixed the value of all the property that he bid upon at $15,000. Schott's valuation was $10,000. Henry L. Cornet, one of appellees, fixed the value of the St. Louis property at the value of his bid, or $4,500. The St. Louis real estate was improved with buildings and had a rental value of $150 to $175 per month with an annual tax of approximately $1,050. Schott testified that when he was endeavoring to interest prospective buyers in the purchase of the property he was submitting sale prices ranging from $150,000 to $250,000, and while it does not appear that these figures were fixed by Wilson there is proof in the record that Schott made many reports to the directors, including Wilson, as to what he was doing in the matter, and a reasonable inference would arise that Schott's valuation to prospective purchasers was submitted with Wilson's consent and approval.

Under the evidence in this case we find that the preponderance of the evidence is that the property,

as listed in the several groups, had a value far in excess of the amounts bid.

The evidence does not disclose any dissension or lack of co-operation existing among the stockholders prior to August, 1932. In January of that year at a stockholders' meeting which had been informally called, the stockholders unanimously agreed that they would not advance any money to the corporation as a working capital, and all voted for a resolution authorizing the directors to make a sale of the property. The resolution of January 2 does not contain specific directions as to the sale, but from the steps taken by the directors in trying to effect a sale it must be assumed that it was contemplated at that time to sell the plant as a whole and as a going concern. This is also indicated by the letter that James B. Wilson and Long wrote on August 27 to Susan Gray Wilson wherein they say: "Up to the present time we have not been successful in finding a purchaser for the plant as a whole and it appears impossible to dispose of it that way. The only alternative as I think is to sell everything piecemeal." In response to said letter or another letter written immediately thereafter Susan Gray Wilson came from California for a stockholders' meeting, arriving in St. Louis on September 24th.

It is the contention of appellees that after the return of Susan Gray Wilson every reasonable effort was made in endeavoring to have a meeting of the stockholders but that Katharine W. Long, appellant herein, would not join with them in holding such a meeting and that she gave verbal notice that she would not attend a meeting unless it was a legally called meeting, and that thereafter appellees and the corporation were forced to take the steps they did in calling the meeting. Appellant's reply is that the reason she did not consent to a meeting was on account of the illness of her husband who was confined in the St. Louis

hospital from September 9th to November 24th, with the exception of the dates, October 9th to 12th; October 21st to November 8th, and November 10th to November 18th. The evidence discloses that James B. Wilson did not call upon appellant and request a meeting and that no notice was prepared calling a legal meeting during the time that Susan Gray Wilson was here, she being here from September 24th to October 25th. The day before Susan Gray Wilson left for California, and at the suggestion of James B. Wilson, she executed a power of attorney to vote her 1,498 shares. She testifies that she selected Mr. Schott as her agent to vote the stock. She also gave him two shares of stock. The consideration therefor is not shown by the evidence. On October 29th, while Long was in the hospital, James B. Wilson and Director Cox passed a resolution calling a special meeting of stockholders for November 15th. Notice was given of this stockholders' meeting in accordance with the statutes of the State and the by-laws of the corporation. This was the first meeting of the stockholders that had been called by formal notice. Prior to the date of the meeting of directors on October 29th, Schott had many interviews with appellant, and in one of those interviews she told him that she was suspicious of the motives of her brother. The principal topic of discussion in these various meetings was the matter of calling a meeting of the stockholders and adopting procedure for the disposal of the corporate property. At that time appellant insisted that in any action taken in reference to calling for bids on the property, there should be a minimum sale price stated.

Sometime prior to November 15th, James B. Wilson, while in St. Louis, made a rough draft of the resolution which was adopted on November 15th and submitted it to Schott who made suggestions in reference to the arrangement and grouping of the property. On the evening preceding the meeting of November 15th, Wil-

son, Schott and the attorneys for the corporation met in Paducah and the resolution was again considered by Wilson and Schott, changed in certain minor parts and given to the attorneys for the final wording in legal phraseology. When the meeting was convened on November 15th, Schott announced that he held a proxy to vote 1,498 shares belonging to Susan Gray Wilson, and thereafter offered the resolution. The evidence shows that this was the first time that appellant had any knowledge of such a resolution, or that any resolution of a similar nature was to be presented at that meeting. The resolution was read and discussed and appellant interposed the objection that it did not contain a minimum sale price. Two attorneys who were acting for and on behalf of the company were present at said meeting. When appellant was asked for her vote she stated that she would not vote on the resolution until she had legal advice. Mr. Wilson states that he heard her say to her husband that "it was cut and dried and she would not vote on it."

After the election of the board of directors, an invitation to bid was prepared, setting forth the property that was included in the various groups as defined in the resolution. It also contained the statement that any stockholder, director, officer or employee should have the same right as any other bidder to bid on said property. There was no right reserved to reject the highest bid in the event that it should be considered inadequate. This invitation to bid, with inventory attached, was mailed to some 300 persons, firms or corporations, the names of whom had been suggested by each of the directors. No notices were posted or published in any newspaper or trade journal. James B. Wilson testified that after January 1, and before the date of sale, he made inquiry of certain persons in Metropolis as to their estimate of the value of the property, and that he did so with a view of knowing what kind of a bid to place upon it.

Wilson denies that there was any intent or design upon his part to acquire this property for his own use to the detriment of the interests of the other stockholders. He does testify, however, that he bid to protect his interest. It does not appear that Schott has any present or future interest in the property other than what he may have acquired as an owner of two shares of stock.

As to the St. Louis property it appears that Cornet & Zeibig, real estate men in St. Louis, represented the Wilson Company in renting the property and collected the rents of that property, and Cornet testifies that he bought it for his own personal use on the expectation that he might be able to sell it to a third party.

It is the settled law of this State that the directors of a corporation are trustees of its business and property. As such directors they are subject to the general rule in regard to trusts and trustees, and cannot in their dealings with the business, or the property of the trusts, use their relation to it for their own personal gain. *Dixmoor Golf Club v. Evans,* 325 Ill. 612; *Higgins v. Lansingh,* 154 Ill. 301.

In the performance of their duties as trustees it is incumbent upon them to administer the corporate affairs for the good and benefit of all the stockholders, and exercise their best care, skill and judgment for the management of the corporate business and act solely in the interest of the corporation. *Farwell v. Pyle-National Headlight Co.,* 289 Ill. 157.

It is the duty of the directors in dealing with the corporate affairs to keep themselves in a position where their own personal interest will not conflict with the best interests of the corporation. *Dixmoor Golf Club v. Evans, supra; Gilman, Clinton & Springfield R. Co. v. Kelly,* 77 Ill. 426.

A director of a corporation cannot become the purchaser of property of the corporation which it is his

duty to sell. *Chicago Hansom Cab Co. v. Yerkes,* 141 Ill. 320. In the *Dixmoor* case, *supra,* the court said:

"He is subject to the ordinary rule that an agent to sell cannot sell to himself, and an agent to buy cannot buy of himself. The interests of buyer and seller are inconsistent, and an agent cannot represent both interests at the same time. While a director is not disqualified from dealing with the corporation and buying its property, or selling property to it, he must act fairly and be free from all fraud or unfair conduct, his transactions will be subjected to the closest scrutiny, and if not conducted with the utmost fairness, to the end that the corporation shall have received full value, they will be set aside. (*Nowak v. National Car Coupler Co.,* 260 Ill. 260.) If he becomes a party to a contract with the corporation, his obligation to candor and fair dealing is increased in the precise degree that his representative character has given him power and control from the confidence reposed in him by the stockholders. (*Beach v. Miller,* 130 Ill. 162.)"

Under the facts in this case we are of the opinion that James B. Wilson violated the duty that rested upon him as a director of this corporation. He had known for months that the then depressed financial condition of the country was such that it would be difficult, if not impossible, to sell such property. From January to August of the same year Schott, on behalf of the company, had contacted 60 persons, firms or corporations of financial standing, endeavoring to interest them in the purchase of this property, but without avail. With such facts before him, it was his plain duty, as a director and in the capacity of trustee of the trust property to keep himself in such a position that he could at all times during the liquidation of the property exercise a fair and impartial judgment on matters arising on the sale of the property, and make every reasonable effort to sell it in such a way that it

would bring the highest price to the corporation. When he filed a bid he removed himself from that position and violated his duty as a director and trustee. It is no excuse for him to say that no other bid was filed and that therefore if it had not been for his bid the sale could not have been made. Under the conditions, as then existing, he should have kept himself in such a position that he could fairly and impartially determine whether or not it was for the best interests of the corporation to sell the property at that time, or if it was to be sold, to place a minimum sale price upon the property before offering it, and reserve in the invitation the right to reject a bid that appeared inadequate. By the filing of his bid he placed his personal interests first, and therefore could not exercise such judgment on behalf of the corporation.

At the stockholders' meeting of November 15th, the resolution could not have been adopted except by vote of a part of the shares owned by James B. Wilson; at the directors' meeting held on January 17th, following the opening of the bids, his bid for $15,000 could not have been declared to be the highest, except for his own vote as a director. Such a transaction cannot stand in equity.

In *Klein v. Independent Brewing Ass'n*, 231 Ill. 594, the court in quoting from the *Higgins* case, *supra*, and *Harts v. Brown*, 77 Ill. 226, used this language:

"It was further said that during the solvency of the corporation the directors are the agents or trustees of the stockholders; and in *Harts v. Brown*, 77 Ill. 226, it was said that a director, in so dealing, must act fairly and be free from all fraud and oppression, and must act for the interest of the company and impose no unfair or unreasonable terms. But it has not been held that the company or its stockholders may not avoid a contract requiring the action of the board of directors to make it, whether made in good faith or not, where

so many of the directors are interested in the contract adversely to the company that the company is not represented by a disinterested majority of the directors voting. On the contrary, it is held that the directors, without the sanction of the stockholders, have no power to contract, for the corporation, with themselves or for the benefit of themselves, and if they attempt to do so the contract may be avoided by the corporation or its stockholders not consenting, whether the contract appears to be fair and just or not.''

It is contended on behalf of appellees that appellant consented, through her husband, to the proceedings that were taken and that therefore she is now estopped to question them. Prior to August, 1932, Stephen H. Long, on one occasion, voted the stock of appellant, but during the period following and prior to the stockholders' meeting November 15th, Wilson, through Schott, recognized that they must have appellant's consent to a stockholders' meeting and endeavored to carry on negotiations with her for that purpose. At the stockholders' meeting she did not vote her own stock, while her husband voted his stock for the resolution. Schott testified that in an interview with Mr. and Mrs. Long prior to November she insisted that the minimum price should be $150,000; that Mr. Long suggested another amount, and that Mrs. Long told him that her husband had no choice in the matter and that Mr. Long acquiesced in her suggestion. We are convinced that Long was not representing his wife's interest and that anything he did does not estop her from questioning these proceedings.

It is our conclusion that fraud and unfair dealing permeate the whole transaction of the sale and all the proceedings leading up to it to such an extent that the sale of the St. Louis property should also be set aside.

A part of the relief prayed for by appellant is that a receiver may be appointed to take charge of and con-

serve the property, and to properly advertise and sell the same and in the event it cannot at this time be readily sold on the market that the said property be preserved and protected until such time as it can be sold.

The general rule is that courts of chancery have no general power to appoint receivers of corporations, but that a receiver can only be appointed where expressly authorized by statute. Appointing a receiver to take possession of the assets of the corporation and to distribute them is tantamount to dissolving a corporation by decree in equity. *Steenrod v. Gross Co.*, 334 Ill. 362; *Blanchard Bro. & Lane v. Gay Co.*, 289 Ill. 413.

There are exceptions to this general rule. "A stockholder may invoke and set in motion the powers of a court of equity to appoint a receiver where the corporation is fraudulently mismanaged by its officers, whereby it is in imminent danger of insolvency, or has been rendered insolvent by reason of such mismanagement." *Blanchard Bro. & Lane, etc., supra.*

Section 86, Cahill's St. 1933, ch. 32, ¶ 86, provides that a court of equity has power to liquidate the assets and business of a corporation upon a suit by a shareholder when it is made to appear that the acts of the directors, or those in control of the corporation, are illegal, oppressive or fraudulent, or that the corporate assets are being misapplied or wasted, and, by section 87 of said Act, it is further provided that in a proceeding to liquidate the assets and business of a corporation the court shall have all the ordinary powers of a court of equity to issue injunctions, to appoint a receiver, or receivers, and take such steps as may be necessary to preserve the corporate assets.

On January 2, 1932, the stockholders unanimously voted for a sale of the assets of the corporation. It is our conclusion that the evidence shows that in the execution of the resolution, a majority of the stock and a

majority of the directors have undertaken a course of procedure in the dissolution of the assets of said corporation that is oppressive and fraudulent as against the interest of the appellant, and that the action taken by the directors in charge of the corporate assets are leading to a misapplication and waste of such assets, and that a receiver should be appointed in accordance with the prayer of appellant's bill.

For the reasons assigned the decree of the circuit court is reversed and the cause remanded with directions to the trial court to enter a decree dismissing the cross-bill of James B. Wilson for want of equity, and to enter a decree in accordance with the views herein expressed.

*Reversed and remanded with directions.*